In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 04-2305

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAFAEL REA-BELTRAN,

*Defendant-Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 158—**James F. Holderman**, *Chief Judge.*

_____

ARGUED FEBRUARY 7, 2006—DECIDED AUGUST 10, 2006

_____

Before BAUER, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Rafael Rea-Beltran, a citizen of
Mexico who previously had been deported from the United
States for battery and drug crimes, was stopped at the
O'Hare International Airport and confessed to immigra-
tion inspectors that he did not have the permission neces-
sary to reenter the United States. Upon being charged with
illegal reentry, *see* 8 U.S.C. § 1326, and use of a false pass-
port, *see* 18 U.S.C. § 1546(a), Mr. Rea-Beltran entered into a
plea agreement with the Government, which was presented
to the district court. However, the district court, unsatisfied
that Mr. Rea-Beltran had established a factual basis for his

guilty plea, rejected it and ordered trial. Mr. Rea-Beltran then was convicted by a jury of illegal reentry and use of a false passport; he was sentenced to 120 months' incarceration.

In his appeal to this court, Mr. Rea-Beltran now challenges the district court's rejection of his guilty plea, the admission of his confession and the district court's refusal to reduce his sentence for acceptance of responsibility, *see* U.S.S.G. § 3E1.1. Because we conclude that the district court abused its discretion in rejecting Mr. Rea-Beltran's guilty plea, we vacate the judgment of conviction and remand for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A.  Facts

Mr. Rea-Beltran is Mexican citizen. He first immigrated to the United States in 1982, married and had two children who reside with their mother in California. He later relocated to Illinois where, over the course of several years, he was convicted of aggravated battery and of several drug crimes. In 1998, he was paroled to the Immigration and Naturalization Service; the agency ordered him deported and instructed him not to return without the express permission of the Attorney General of the United States.

Mr. Rea-Beltran subsequently attempted to reenter the United States on February 13, 2003. Shortly after midnight, he arrived at the O'Hare International Airport in Chicago, Illinois, on a flight from Mexico. At customs, he presented a passport bearing the name "Jose Beltran Rea" and informed an immigration inspector that the purpose of his

visit was to see a sick cousin. The inspector noticed that Mr. Rea-Beltran's passport contained an unusual visa stamp and led him to a separate area for questioning. Continuing the questioning, the inspector scanned Mr. Rea-Beltran's fingerprints into a computer to verify his identity. The computer eventually revealed that Mr. Rea-Beltran's first name was not "Jose" but "Rafael"; on this basis, the inspector determined that Mr. Rea-Beltran was inadmissible and summoned an additional immigration official to continue the investigation.

After approximately two hours had passed, a second official, Lori Glud, arrived in the inspection room where Mr. Rea-Beltran was being interviewed. Inspector Glud conducted an additional computer search and discovered that Mr. Rea-Beltran was a documented alien who previously had been deported. Learning this, the inspectors then asked Mr. Rea-Beltran if he had obtained the permission of the Attorney General to reenter the United States. He confessed that he had not.

Shortly thereafter, Gerardo Guzman, a Spanish-speaking immigration inspector, arrived to assist the others in taking a sworn statement from Mr. Rea-Beltran. Before doing so, Inspector Guzman informed Mr. Rea-Beltran for the first time of his *Miranda* rights, reading them to him in Spanish, Mr. Rea-Beltran's native language. Mr. Rea-Beltran signed a waiver that explained he understood these rights and was willing to make a statement without a lawyer present. With translation from Inspector Guzman, Mr. Rea-Beltran and Inspector Glud then engaged in a transcribed exchange in which Mr. Rea-Beltran admitted once again that he had not sought the Attorney General's permission to reenter the United States.

**B. District Court Proceedings**

On February 20, 2003, Mr. Rea-Beltran was arraigned on charges of illegal reentry, *see* 8 U.S.C. § 1326,[1] and use of a false passport, *see* 18 U.S.C. § 1546(a).[2] At his arraignment hearing, he pleaded not guilty to both charges. Less than one month later, however, Mr. Rea-Beltran retained new counsel and entered into a plea agreement with the Government. The agreement stipulated that Mr. Rea-Beltran would plead guilty to the charge of illegal reentry, and, in exchange, the Government would dismiss the false passport charge[3] and recommend at sentencing that, under

---

[1] Title 18, § 1326 of the United States Code makes it a crime for an alien to reenter, or attempt to reenter, the United States after previously having "been denied admission, excluded, deported, or removed." 18 U.S.C. § 1326(a)(1). Section 1326 has several alternative penalties. For simple reentry, under § 1326(a), the maximum sentence is two years. If the defendant has a prior felony conviction, the maximum sentence is ten years under § 1326(b)(1), and, if that prior conviction was an aggravated felony as that term is defined in 8 U.S.C. § 1101(a)(43), the maximum sentence is twenty years under § 1326(b)(2). Here, Mr. Rea-Beltran was prosecuted under § 1326(b)(2), the harshest penalty provision, because he had two prior qualifying convictions.

[2] In relevant part, 18 U.S.C. § 1546(a) criminalizes the knowing possession or use of counterfeit immigration documents, including visas or any "other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States."

[3] Under the terms of the plea agreement, the Government retained the right to treat Mr. Rea-Beltran's use of a false passport

the 2002 edition of the United States Sentencing Guidelines, Mr. Rea-Beltran's base offense level should be 8.

At the ensuing change of plea hearing, the district court engaged Mr. Rea-Beltran in a plea colloquy to confirm that he was competent to plead guilty, was proceeding freely and voluntarily, and was knowledgeable about the charge, the possible penalties he faced and his constitutional rights. The court also had the Government present a specific factual basis supporting the § 1326(a) charge, to which Mr. Rea-Beltran assented. Satisfied with Mr. Rea-Beltran's answers, the court accepted the plea agreement and entered a plea of guilty.

At the ensuing sentencing hearing, the parties' plea agreement began to unravel. Represented by new counsel, Mr. Rea-Beltran indicated to the court that his previous guilty plea may not have been made knowingly. To resolve this matter, the court heard formal testimony from Mr. Rea-Beltran's former counsel and from Mr. Rea-Beltran to determine what the defendant understood when he previously pleaded guilty. Eventually, the following exchange occurred between Mr. Rea-Beltran and counsel for the Government ("AUSA"):

> [AUSA:] [W]hen you reentered the country in February of this year, on February 13th, you understood that you were violating your agreement not to reenter the country or the order not to reenter the country, correct?
>
> [MR. REA-BELTRAN:] Yes, I understand that, but they fooled—

---

[3] (...continued)
as "relevant conduct" for sentencing purposes. *See* U.S.S.G. § 1B1.3.

[AUSA:] That—

[MR. REA-BELTRAN:] —me with the passport.

[AUSA:] And, in fact—

THE COURT: I didn't hear the last part of that. You understood that you were violating the order not to reenter the country, but what?

[MR. REA-BELTRAN] (through interpreter): It had already been five years. I remember they told me it was five years.

THE COURT: Who told you five years?

[MR. REA-BELTRAN:] The judge.

THE COURT: When you were sentenced, the judge told you you couldn't reenter the country for five years?

[MR. REA-BELTRAN:] I think so, if I remember correctly. I was very bad in my head—I mean, not my head, but my ulcer, I was really bad.

THE COURT: So you didn't think you were violating the order when you came into the country on February 13th of—what year was it? This year?

[AUSA:] Yes, Your Honor, February 13th, 2003.

THE COURT: So you didn't think you were violating the order when you came into the country on February 13th, 2003?

[MR. REA-BELTRAN:] I didn't think that at the time.

THE COURT: Okay. I think what we're going to have to end up doing is trying this case. Perhaps there have been some difficulties that have resulted from the past, and I agree with you, [defense counsel], this man did not understand.

. . .

> I'm going to vacate the plea agreement, because the defendant has now expressed his innocence by saying at the time of the offense, he did not know he was violating the law, and we'll set the case for trial on September 22.

R.29-1 at 43-46.

Multiple pre-trial hearings followed and Mr. Rea-Beltran continued in his attempts to plead guilty. Each time, the district court refused to accept Mr. Rea-Beltran's guilty plea because, in the court's view, he did not appear to comprehend fully the rights that he was attempting to waive. At each plea opportunity, when pressed on whether he understood that pleading guilty meant that he no longer could file any pre-trial motions, Mr. Rea-Beltran appeared hesitant and confused; the court interpreted these responses as a reluctance to plead guilty.

Finally, on January 16, 2004, Mr. Rea-Beltran sought to plead guilty once again, titling his motion, "One Last Chance." R.45. At the hearing to decide this motion, the court asked Mr. Rea-Beltran whether there were any remaining motions that he wished to file. The court reminded Mr. Rea-Beltran that, at a previous hearing, he had told the court that he desired to file certain motions but was unsure whether they were appropriately pre-trial or post-trial. In response, Mr. Rea-Beltran stated that he did not remember these events. Then, when asked if he remembered any other part of the hearing, he answered: "The truth is I don't remember much." R.73-1 at 5. At this point, the district court informed Mr. Rea-Beltran and his counsel that it was denying the motion to plead guilty. It gave the following rationale for its decision:

> [I]t seems to me that Mr. Rea-Beltran, despite his
> commentary, would probably, in my opinion, say that
> whatever proceedings we have today, he won't remem-
> ber very much or that he didn't understand.
>
> And so, consequently, it seems to me that in order to
> ensure that all of his rights are protected and there is no
> argument at a later time that he did not knowingly and
> voluntarily waive his rights, it seems to me we should
> proceed to trial on Tuesday.

*Id.* at 5-6.

On the first day of trial, Mr. Rea-Beltran moved to sup-
press his confession in which he admitted to immigration
inspectors that he lacked the necessary permission to reenter
the United States. He argued that his sworn confession,
although rendered after the administration of *Miranda*
warnings, was nevertheless inadmissible because it came
after inspectors already had induced him to admit, without
being warned, that he had entered the country illegally. The
district court denied the motion to suppress. The court
reasoned that, even lacking warnings, the first statement did
not taint the later, warned admission because the question-
ing that produced the first admission amounted to a
permissible border inspection, not a custodial interrogation.

At Mr. Rea-Beltran's sentencing hearing, which took place
after a jury found him guilty of both counts of the indict-
ment, the district court concluded that a two-point enhance-
ment for obstruction of justice was appropriate given Mr.
Rea-Beltran's false testimony at his suppression hearing.
The district court also denied him a reduction for acceptance
of responsibility, *see* U.S.S.G. § 3E1.1. In the court's view, it
was Mr. Rea-Beltran who desired to have a trial and, despite
repeated opportunities to plead guilty, never made the

showing necessary to waive his rights and admit to the underlying factual basis for the charge. The court sentenced Mr. Rea-Beltran to a term of 120 months' imprisonment, followed by three years' supervised release.

## II

## DISCUSSION

Mr. Rea-Beltran raises three issues in this appeal, but we need only address his first, threshold contention that the district court should have allowed him to plead guilty. His other arguments—that his confession should have been suppressed and that the court committed sentencing errors–-need not be addressed in view of our conclusion that Mr. Rea-Beltran's guilty plea must be reinstated and his case remanded for resentencing.[4] We shall turn, then, to the district court's decision to reject Mr. Rea-Beltran's guilty plea.

It is well-established that a criminal defendant has "no absolute right to have a guilty plea accepted." *Santobello v. New York*, 404 U.S. 257, 262 (1971). Even when presented with a constitutionally valid plea attempt, a court retains a large measure of discretion to decide whether a guilty plea is appropriate in the circumstances of a particular case. *See*

---

[4] Mr. Rea-Beltran also maintains, without opposition from the Government, that we must order a limited remand for the court to determine whether it would have imposed the same sentence had it known that the United States Sentencing Guidelines were advisory. *See United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). We need not consider this matter either because, upon resentencing, the district court surely will understand the now-advisory nature of the Guidelines.

*North Carolina v. Alford*, 400 U.S. 25, 38 n.11 (1970). To guide the exercise of this discretion, Federal Rule of Criminal Procedure 11 requires that an extensive plea colloquy take place between the defendant and the district court before the entry of a guilty plea. The primary purpose of the colloquy is to safeguard against the hasty acceptance of guilty pleas that are not made in a knowing and voluntary fashion. Thus, the rule instructs the court, in conducting the colloquy, to make sure that the defendant understands the trial rights that he is waiving, the nature of the charge, the possible penalties, his right to appeal and the court's discretion to depart from the Sentencing Guidelines. *See* Fed. R. Crim. P. 11(b)(1), (2).

In addition to the "knowing and voluntary" inquiry, Rule 11 requires the district court to satisfy itself that a "factual basis" exists for the guilty plea. *Id.* 11(b)(3). This measure is designed to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." *Id.* advisory committee's note (1966 Amendments); *see also United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002). Normally, the factual basis contemplated by Rule 11 is established when the defendant " 'describe[s] the conduct that gave rise to the charge.' " Fed. R. Crim. P. 11 advisory committee's note (1974 Amendments) (quoting *Santabello*, 404 U.S. at 261); *see also, e.g., United States v. Cooper*, 942 F.2d 1200, 1207-08 (7th Cir. 1991). The factual basis need not arise only from the defendant's admissions, however; we have held that the court "may find the factual basis from anything that appears on the record, which includes the government's proffer." *United States v. Musa*, 946 F.2d 1297, 1302 (7th Cir. 1991) (internal citation omitted). Presented with this range of factual material, the court then must ascertain whether " 'the conduct which the

defendant admits constitutes the offense charged in the indictment.'" *McCarthy v. United States*, 394 U.S. 459, 467 (1969) (quoting Fed. R. Crim. P. 11 advisory committee's note (1966 Amendments)). Put simply, there must be adequate factual support for each element of the crime to which the plea is offered. *See, e.g., Musa*, 946 F.2d at 1302-03.

Most appeals of Rule 11 decisions arise in the reverse context of this case. In the more typical scenario, the defendant seeks to withdraw a guilty plea by challenging the sufficiency of the factual basis established at the plea colloquy; his hope is that, through such a challenge, he can erase his guilty plea and try his luck before a jury. *See, e.g., id.*, 946 F.2d at 1302-03; *Cooper*, 942 F.2d at 1207-08. Here, by contrast, Mr. Rea-Beltran is asking us to reinstate his guilty plea, contending that he indeed admitted a factual basis sufficient for the court to accept his plea. From this result, Mr. Rea-Beltran wishes to salvage his plea agreement with the Government, which would have dismissed the false passport charge and recommended a more favorable sentence.

Our review of this issue is deferential. In recognition of the significant discretion that district courts possess in accepting or rejecting guilty pleas, we reverse only when that discretion is abused. *See United States v. Kelly*, 312 F.3d 328, 330 (7th Cir. 2002). As a general matter, we trust the district court's assessment of a defendant's knowledge and voluntariness because of the court's ability, unlike our own, to observe the defendant in person and examine his demeanor. On the other hand, "a court cannot act arbitrarily in rejecting a plea." *Id.* To facilitate meaningful appellate review and "foster the sound exercise of judicial discretion," we require that courts state on the record "a sound reason" for rejecting a plea. *United States v. Kraus*, 137 F.3d 447, 453

(7th Cir. 1998) (internal quotation marks omitted). Failure to do so requires reversal.

In view of this standard, Mr. Rea-Beltran contends that the district court did not articulate adequate reasons for rejecting his plea attempts. Our focus is on the July 18, 2003 sentencing hearing in which the court vacated the parties' plea agreement and withdrew Mr. Rea-Beltran's guilty plea. That decision came on the heels of the court's attempt to find, consistent with Rule 11(b)(3), a factual basis for the plea of guilty. In a dialogue with the court, Mr. Rea-Beltran had indicated that, when he reentered the country on February 13, 2003, he believed that he had permission to do so. Understanding this to be an expression of innocence, the court rejected the plea and ordered trial.

We believe that the district court, in interpreting Mr. Rea-Beltran's statements to be an expression of innocence, misapprehended the elements of the Government's burden. To prove a violation of the illegal reentry statute, 8 U.S.C. § 1326(a), the Government must establish: (1) that the defendant is an alien; (2) that the defendant was deported or removed in accordance with a valid deportation order; and (3) that the defendant has reentered the United States without the permission of the Attorney General. *See United States v. Torres*, 383 F.3d 92, 95 (3d Cir. 2004). Although the defendant must intend to commit the act of reentry to be guilty of this offense, the belief that he is reentering "without the Attorney General's express consent is not an element of section 1326." *United States v. Carlos-Colmenares*, 253 F.3d 276, 278 (7th Cir. 2001) (overruling *United States v. Anton*, 683 F.2d 1011 (7th Cir. 1982)). Thus, even if a defendant reasonably but mistakenly believes that he is permitted to reenter the United States, he is guilty of violating § 1326(a). *See id.* at 280 ("If [a deported alien] decides to return, he had

better make sure he has the Attorney General's express consent.").

Here, the district court's rejection of Mr. Rea-Beltran's guilty plea appears to have rested on the legal misapprehension that Mr. Rea-Beltran would be innocent of illegal reentry if he had thought that his reentry was permitted. As we just have explained, Mr. Rea-Beltran's mistaken belief would offer him no defense to the charge of violating § 1326(a). Thus, in light of the court's misunderstanding of the law, we have no choice but to find an abuse of discretion in the court's refusal to accept Mr. Rea-Beltran's guilty plea; " '[a] district court by definition abuses its discretion when it makes an error of law.' " *United States v. McMutuary*, 217 F.3d 477, 483 (7th Cir. 2000) (alteration in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

The Government contends that the court's error was harmless because all Mr. Rea-Beltran stood to gain from pleading guilty was the prospect of an offense-level reduction for acceptance of responsibility—a prospect that, in the Government's view, was exceedingly slim. *See* U.S.S.G. § 3E1.1. The Government also maintains that reversal would be "pointless" because Mr. Rea-Beltran already has received a fair trial. Appellee's Br. at 29. These arguments miss the mark. First, by having his plea rejected, Mr. Rea-Beltran lost the opportunity to benefit from his plea agreement with the Government in which the Government promised to drop the false passport charge in exchange for Mr. Rea-Beltran's plea of guilty to illegal reentry. Forced to proceed to trial, Mr. Rea-Beltran instead was convicted of both charges. Although receiving two convictions rather than one may have had no ultimate impact on Mr. Rea-Beltran's sentence, the collateral consequences flowing from an additional conviction have been recognized as prejudicial. *See United States v.*

*Maddox*, 48 F.3d 555, 560 (D.C. Cir. 1995); *United States v. Delegal*, 678 F.2d 47, 52 (7th Cir. 1982). "For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction." *Ball v. United States*, 470 U.S. 856, 865 (1985).

The Government's other harmless error argument is equally meritless. By contending that Mr. Rea-Beltran suffered no prejudice because he received a fair trial, the Government ignores the fact that Mr. Rea-Beltran is not complaining that his trial was unfair. Rather, his complaint is that he should not have received a trial at all and instead been permitted to plead guilty. Having incurred an additional conviction because his plea attempts were frustrated, the verdict resulting from the jury trial cannot stand, regardless of how fairly the proceedings were conducted.

## Conclusion

For the foregoing reasons, we vacate Mr. Rea-Beltran's conviction and remand with instructions to permit Mr. Rea-Beltran to offer a guilty plea on the terms originally agreed to by the Government. Upon satisfactory completion of the plea proceedings, the district court shall resentence Mr. Rea-Beltran.

REVERSED and REMANDED

No. 04-2305                                                    15

A true Copy:

  Teste:

          _____
          *Clerk of the United States Court of*
          *Appeals for the Seventh Circuit*