In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2647

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN HERNANDEZ-RIVAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 CR 73—**Rudy Lozano**, *Judge.*

ARGUED OCTOBER 23, 2007—DECIDED JANUARY 23, 2008

Before BAUER, CUDAHY, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* On May 10, 2005, around 10:00 a.m., Trooper Jason Carmin of the Indiana State Police was traveling eastbound in the left lane of the Indiana Toll Road. Approximately 200 or 300 feet ahead of him in the right lane, he saw a full-sized white van with California license plates and tinted windows. He also saw another vehicle in the right lane behind the van, as well as other vehicles traveling in front of the van. Trooper Carmin watched the van cross over the center line about one foot into the left lane two times within one mile, without using its turn signal. Believing the driver of the van to be intoxicated and a possible danger to other vehicles on the road, Trooper Carmin

pulled the van over. He approached the vehicle and asked the driver for his license. The driver appeared nervous; his hands were shaking and he would not make eye contact. Trooper Carmin told the driver to exit the vehicle and proceeded to ask the driver some questions.

The driver told Trooper Carmin that he was traveling from California to New Jersey, and that he did not know the name of the owner of the van. While the driver stood at the back of the van, Trooper Carmin approached the passenger side. Hernandez-Rivas was sitting in the front seat. The trooper asked Hernandez-Rivas who owned the van. Hernandez-Rivas told him that the van was a rental, but could not produce any rental agreement. When Trooper Carmin asked the other eleven passengers if anyone had proper documentation to be in the United States legally, no one responded. Trooper Carmin noticed that the passengers were wearing several layers of clothes, and that there was trash scattered on the floor of the van.

The trooper contacted Immigration and Customs Enforcement ("ICE") agents because he believed he was dealing with a human trafficking case. He also issued the driver a written warning for unsafe lane movement. Hernandez-Rivas and the other occupants of the van were transported to a nearby police station in Chesterton, Indiana, where ICE Special Agents Rodolfo Medellin and Karel Matyska conducted interviews of Hernandez-Rivas, the driver, and the other occupants of the van. Hernandez-Rivas was carrying a California Identification Card, a Mexican Identification Card, and $2,599.85 in United States currency. During the interview, Hernandez-Rivas confessed that on May 10, 2005, he was transporting fifteen illegal aliens from California to New Jersey, and that for his services, he would receive $3500 from a man named Abraham. He also said that before the van was pulled over by Trooper Carmin, he dropped off four passengers in the Chicago area, collecting $500 to $650

from relatives that were waiting to pick up the passengers. He admitted that he made three previous trips in the month of May, with fifteen to sixteen passengers in the van on each trip. The agents also learned that Hernandez-Rivas had been previously removed from the United States and had reentered the country illegally.

On May 18, 2005, Hernandez-Rivas was indicted for conspiring to transport illegal aliens for commercial or private gain, transporting illegal aliens for commercial or private gain, and illegal re-entry into the United States after being deported. On July 22, 2005, an amended plea agreement was filed with the court, where Hernandez-Rivas agreed to plead guilty to the first two charges in exchange for the government's dismissal of the illegal reentry charge.

A plea hearing for Hernandez-Rivas was held on August 9, 2005.[1] Initially, the district court judge told Hernandez-Rivas that "[i]f you can't hear the interpreter, if the electronic equipment doesn't work, or for some reason you can't hear [the interpreter] tell me and I'll have her repeat the interpretation or we'll have to fix the equipment. Do you understand?" Hernandez-Rivas stated that he did. Pursuant to Federal Rule of Criminal Procedure 11, the judge engaged Hernandez-Rivas in a colloquy to determine whether, *inter alia*, he understood the nature of the charges against him, what the possible penalties were, and whether he was coerced or threatened by anyone to plead guilty. Hernandez-Rivas's responses satisfied the judge, and thereafter, pursuant to Rule 11(b)(3), he attempted to elicit a factual basis for the guilty plea

---

[1] Although Hernandez-Rivas understands some English, a Spanish interpreter was present at all proceedings. Furthermore, District Court Judge Rudy Lozano, who presided over all of the proceedings, is fluent in Spanish.

from Hernandez-Rivas. The judge first asked him why he was guilty, and Hernandez-Rivas explained that a man told him to transport individuals from Los Angeles to New Jersey, in exchange for $1000. The following exchange then took place between the district court judge and Hernandez-Rivas:

Q: Did you ask [the man] any questions of who you were going to transport?

A: No, I never asked him.

Q: Did you know anything about the people you were going to transport?

A: No, I didn't know that either.

Q: Were you ever told anything about the people you were going to be    transporting?

A: No, that was never told to me.

Q: Would you have to deduct anything [from the payment of $1000] for expenses? Was that a thousand dollars free and clear?

A: No, that thousand dollars was payment for the work of having driven.

. . .

Q: At the time, did you believe that you were doing anything illegal?

A: No, your Honor. At no time did I believe that I was doing anything illegal.

Q: Did you ever ask any questions regarding whether anything you were going to be doing would be illegal?

A: No, I never asked any questions, your Honor.

. . .

Q: You didn't think anything was illegal because of how much money you were getting?

A: No, your Honor.

The court called for a sidebar, and the prosecutor immediately stated, "I say just go to trial, Judge." Hernandez-Rivas's counsel asked the district judge if the Spanish interpreter was translating correctly, and he responded that she was. The judge said he was "struggling" with eliciting the factual basis, and expressed concern that giving Hernandez-Rivas opportunity to take a break would result in Hernandez-Rivas returning with a different story. A second illustrative dialogue between the district judge and Hernandez-Rivas followed:

Q: Did you ever suspicion that the individuals in the van were illegal aliens?

A: No, your Honor, I never had those suspicions.

Q: If you had known that they were illegal aliens, would you have continued to transport them to New Jersey?

A: No, sir.

. . .

Q: Did anything occur on the trip that led you to believe that these individuals were illegal aliens?

A: No, your Honor.

The judge called another sidebar, and once more expressed skepticism that Hernandez-Rivas's statements established a sufficient factual basis. The prosecution again requested that they proceed to trial. The judge granted a recess to allow counsel for Hernandez-Rivas to speak with his client, but expressed hesitation in doing so, stating, "I have no problem with [counsel speaking to Hernandez-Rivas], but I'm not sure I'll accept a differ-

ent story. I gave [him] two opportunities. I told [him] to be totally honest with me."

After the recess, the judge gave Hernandez-Rivas yet another opportunity to explain why he was guilty. He told the judge that he began to realize he was transporting illegal aliens when they left Los Angeles, and became more aware of their illegal status when they arrived in Chicago. Hernandez-Rivas said that he did not understand the judge's previous questions because the headphone he was using to hear the Spanish interpreter was making noise. He also blamed the misunderstanding on his nerves and the length of the hearing. Hernandez-Rivas then admitted that he "would like to accept responsibility," and that he was "guilty of having brought these people [into the United States] without documents."

The district judge stated that there was not a sufficient factual basis made, commenting that even if he were to accept the answers from the second colloquy, he was not confident that he could "give [the answers] any credibility because of the inconsistency to the first answers." The judge went on to say "[i]f anything, it's more suspect" that Hernandez-Rivas's stories were inconsistent. Consequently, the judge rejected Hernandez-Rivas's guilty plea, finding that there was not a sufficient basis for a finding of guilty and Hernandez-Rivas's answers were "totally inconsistent."

On November 18, 2005, during a motions hearing, Hernandez-Rivas made another attempt to plead guilty, which the court denied, again noting the inconsistencies in his stories.

On November 21, 2005, an evidentiary hearing was held on Hernandez-Rivas's motion to suppress the evidence seized following Trooper Carmin's traffic stop and subsequent search of the van. Hernandez-Rivas argued that the stop was pretextual because Trooper Carmin believed the

occupants were suspicious. The district court denied the motion, finding that the stop was not pretextual, and that Trooper Carmin had reasonable suspicion to stop the van when he saw it swerve over the white center line twice in one mile, while other vehicles were in the vicinity, and the van's movements violated §§ 9-21-8-24 and 9-21-8-11 of the Indiana Motor Vehicle Code. Moreover, the court found that improper lane usage is a legitimate reason for an investigatory stop. The district court also held that Trooper Carmin had probable cause to believe that the driver of the van had committed a traffic offense and posed a danger to others on the road.

On January 3, 2006, Hernandez-Rivas filed a motion to dismiss his counsel, claiming that his attorney told him that the judge would only accept his plea if Hernandez-Rivas said that he knew the occupants of the van were illegal aliens. Hernandez-Rivas further contended that, in fact, he did not know that the occupants were undocumented, and he did not want to be untruthful. The court denied his motion, finding that Hernandez-Rivas's attorney had an obligation to tell Hernandez-Rivas the truth—that the judge would not accept the plea because Hernandez-Rivas could not provide a sufficient factual basis.

The jury trial began on March 13, 2006. Before voir dire, Hernandez-Rivas petitioned the court to allow him to plead guilty, arguing that he confused the laws of the United States with the laws of Mexico, and he "want[ed] to accept responsibility for his actions." The judge rejected the plea once again, noting the many inconsistencies in Hernandez-Rivas's stories, and that he could not certify that Hernandez-Rivas was making a knowing and voluntary plea when he provided the court with a different story each time.

A jury found Hernandez-Rivas guilty of conspiring to transport and transporting illegal aliens for commercial or

private gain, both in violation of 8 U.S.C. §1324(a)(1)(A), and illegal re-entry into the United States after being deported, in violation of 8 U.S.C. §1326(a). Hernandez-Rivas was sentenced to sixty-three months and twenty-four months' imprisonment, to be served concurrently. This timely appeal followed.

First, Hernandez-Rivas argues that the district court erred in finding that Trooper Carmin had reasonable suspicion and probable cause to stop the van that Hernandez-Rivas was traveling in, because the driver did not violate any Indiana traffic laws, particularly §§ 9-21-8-24 and 9-21-8-11 of the Indiana Motor Vehicle Code.

On appeal, Hernandez-Rivas argues on different grounds than he asserted in his motion to suppress. Hernandez-Rivas argued in his motion that the stop was pretextual under *United States v. Trigg*, 878 F.2d 1037 (7th Cir. 1989), claiming that Trooper Carmin's stop was based on his heightened scrutiny of the van due to its occupants. He concedes in his reply brief that the stop was not pretextual, and instead argues that Trooper Carmin lacked reasonable suspicion or probable cause to stop the van under any circumstances, without regard to the officer's underlying motive.

Arguments not raised before the trial court are forfeited on appeal, resulting in our review for plain error only. *See United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003). However, Hernandez-Rivas essentially makes the same underlying argument here as he did in his motion to suppress—that the trooper did not have reasonable suspicion or probable cause to stop the van—so the issue was properly preserved for appeal.[2]

---

[2] We note that accusing an officer of making a "pretextual" stop warrants little discussion in light of *Whren v. United States*, 517 U.S. 806, 813 (1996), where the Supreme Court foreclosed the
(continued...)

We review a district court's legal conclusions on a motion to suppress *de novo*, and the underlying findings of fact for clear error. *United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007). Reversal is warranted only when we are left with the definite and firm conviction that a mistake has been made. *Id.* Because the resolution of a motion to suppress is a fact-specific inquiry, we give deference to credibility determinations of the district court judge, who had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing. *United States v. Parker,* 469 F.3d 1074, 1077 (7th Cir. 2006).

An officer has probable cause for a traffic stop when he has an objectively reasonable basis to believe a traffic law has been violated. *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007). Moreover, probable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense. *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000) (citing *Whren v. United States*, 517 U.S. 806 (1996)).

Trooper Carmin testified that he observed the van, traveling in the left lane, move partly into the right lane and back to the left lane twice in one mile without a turn signal. The trooper also testified that there were other vehicles on the roadway, in the vicinity of the van. The district court credited the trooper's testimony when it found that the van's movements were in violation of

---

[2] (...continued)

pretextual argument, holding that the subjective motivations of an officer in stopping a vehicle are irrelevant to an ordinary probable cause analysis. *See also United States v. Moore*, 375 F.3d 580, 583 n.1 (7th Cir. 2004); *United States v. Robinson*, 314 F.3d 905, 907 (7th Cir. 2003).

§§ 9-21-8-24 and 9-21-8-11 of the Indiana Motor Vehicle Code,[3] and Hernandez-Rivas admits on appeal that the van crossed over the center lane twice within one mile. We have held improper lane usage is a legitimate reason for an investigatory stop. *See United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991) (stop of a car for twice running over the left and right fog lines of the highway); *United States v. Fiala*, 929 F.2d 285, 288 (7th Cir. 1991) (stop of a car for weaving over the fog line of the highway for 5-10 seconds).

Hernandez-Rivas maintains that the van was predominately in the same lane and maintained a direct course, therefore its movements were not a change from one traffic lane to another, and were conducted with reasonable safety. However, this argument was rejected by the district court when it credited Trooper Carmin's testimony in holding that the van violated either provision of the Indiana Code. We see no reason to disturb the district court's finding that the stop was valid and supported by probable cause.

Next, Hernandez-Rivas argues that the district court abused its discretion when it refused to accept his

---

[3] Section 9-21-8-24 provides, in part, that "[a] person may not . . . change from one (1) traffic lane to another; unless the movement can be made with reasonable safety. Before making a movement described in this section, a person shall . . . give an appropriate stop or turn signal . . . if any other vehicle may be affected by the movement."

Section 9-21-8-11 provides, in part, that "whenever a roadway has been divided into three (3) or more clearly lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from the lane until the person who drives the vehicle has first ascertained that the movement can be made with safety." The Indiana Toll Road is a four-lane roadway.

guilty plea, because it did not consider any other evidence other than Hernandez-Rivas's allocution, and the court failed to determine if there was a factual basis to support whether Hernandez-Rivas demonstrated "reckless disregard" for the illegal status of the occupants in the van. Hernandez-Rivas also claims that the district court erred by failing to consider his later attempts to plead guilty.

A defendant has no absolute right to have a court accept his guilty plea, and a court may reject a plea in the exercise of sound judicial discretion. *Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Lucas,* 429 F.3d 1154, 1157 (7th Cir. 2005). Nevertheless, a court cannot arbitrarily reject a plea, and must articulate on the record a "sound reason" for the rejection. *United States v. Kelly,* 312 F.3d 328, 330 (7th Cir. 2002). Our review is deferential, recognizing that the district court has significant discretion in accepting or rejecting guilty pleas. *United States v. Rea-Beltran*, 457 F.3d 695, 701 (7th Cir. 2006). We reverse only for an abuse of that discretion. *Id.*

To guide courts in this exercise of discretion, Federal Rule of Criminal Procedure 11 requires that a reasonable plea colloquy take place between the court and the defendant, to ensure that the defendant makes a knowing and voluntary plea. The court must ensure that the defendant was not coerced into making the plea, and that he understands the nature of the charges against him.

The court must also determine that a sufficient factual basis exists for a guilty plea. Fed. R. Crim. P. 11(b)(3). A district court may find the factual basis in anything that appears on the record, however, the factual basis contemplated by Rule 11 is normally established when the defendant describes the conduct that gave rise to the

charge.[4] *Rea-Beltran*, 457 F.3d at 701; *see also Lucas,* 429 F.3d at 1157 ("This factual basis is most easily established when a defendant describes the conduct that gave rise to the charge in the indictment.") (internal quotations omitted)*; United States v. Fountain*, 777 F.2d 351, 356 (7th Cir. 1985), *cert. denied*, 475 U.S. 1029 (1986) ("[A] dialogue between the court and the person making the plea is the best method for establishing the factual basis of a plea as well as its voluntariness."); *but see United States v. Arenal*, 500 F.3d 634, 638 (7th Cir. 2007) (finding that the district court may consider not only the information proffered at the plea hearing, such as the plea agreement, but also information contained in the pre-sentencing report to establish a factual basis before entry of judgment and imposition of sentence).

Hernandez-Rivas argues that the court abused its discretion when it did not consider any evidence other than his unsuccessful attempt to provide a factual basis. Rule 11 encourages this kind of factual questioning by instructing that a judge should not accept a plea of guilty without being satisfied that there is a factual basis for the plea. *See* Fed. R. Crim. P. 11(f). While it is true that the district judge had a number of options to find a factual basis, including a confession that was con-

---

[4] Fed. R. Crim. P. 11(f) advisory committee's notes to the 1966 Amendments state: "The court should satisfy itself, by inquiry of the defendant *or* the attorney for the government, *or* by examining the presentence report, *or* otherwise, that the conduct which the defendant admits constitutes the offense charged in the indictment or information or an offense included therein to which the defendant has pleaded guilty. Such inquiry should, e.g., protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." (emphasis added).

tained in Hernandez-Rivas's plea agreement or eliciting the facts from the prosecutor, we believe that the judge did not err in looking to Hernandez-Rivas to provide the factual basis. Moreover, during the initial colloquies, it was apparent Hernandez-Rivas claimed that he did not understand that his actions constituted a crime: he stated that he did not know he was being paid to transport illegal aliens, and had he known the individuals were illegal aliens, he would not have continued to drive them across the country. His statements led the judge to believe that Hernandez-Rivas's plea was not knowing and voluntary, a Rule 11 requirement that must be satisfied in order for a court to accept a guilty plea. *See United States v. LeDonne*, 21 F.3d 1418, 1423 (7th Cir. 1994) ("Unless the defendant understands the elements of the crime he is admitting, his plea cannot be said to have been knowingly and voluntarily entered.").[5] Therefore, the district court judge did not abuse his discretion when he rejected Hernandez-Rivas's guilty plea after repeated attempts to obtain a sufficient factual basis from Hernandez-Rivas under Rule 11.

Hernandez-Rivas further contends that the judge limited its inquiry to whether Hernandez-Rivas knew that he was transporting illegal aliens, and that the statute requires a lesser standard of reckless disregard under

---

[5] In addition to the court, the prosecutor should also be unwilling to accept a defendant's guilty plea if it is unclear whether the defendant understands or has admitted to the charges against him. *See Nevarez-Davis v. United States*, 870 F.2d 417, 421 (7th Cir. 1989). Here, after Hernandez-Rivas's initial failed attempt to provide a factual basis, the prosecutor fulfilled his duty by telling the court on numerous occasions thereafter that he wanted to go to trial.

8 U.S.C. §1324(a)(1)(A).[6] He believes that the judge "had an obligation to probe further to develop a factual basis as to whether Mr. Hernandez-Rivas was in reckless disregard of the fact that his passengers were unlawful aliens." We disagree. During the first two attempts to elicit a factual basis, the judge specifically questioned Hernandez-Rivas about whether he knew that he was doing something illegal. He gave Hernandez-Rivas ample opportunity to tell the court why he was guilty, and Hernandez-Rivas simply denied that he had any knowledge of the illegality of his actions.

Finally, Hernandez-Rivas argues that the court erroneously denied all subsequent attempts by Hernandez-Rivas to plead guilty. He relies on a D.C. Circuit case, *United States v. Maddox*, 48 F.3d 555 (D.C. Cir. 1995), where the district court judge asked Maddox during the plea colloquy if he was guilty of conspiring to distribute cocaine base, and Maddox responded, "No." The district court then immediately rejected his guilty plea and set the case for trial, and denied a later request to plead guilty, stating that the plea would not be voluntary. The D.C. Circuit specifically declined to accept Maddox's claim that a district court could not reject a guilty plea based solely on a defendant's refusal to admit factual guilt of a crime, holding that a court could in fact reject a plea in this instance due to doubts about the voluntariness of the plea. However, the D.C. Circuit remanded the case back to the district court to conduct new plea pro-

---

[6] 8 U.S.C. § 1324(a)(1)(A) provides, in part, that "[a]ny person who . . . (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" is subject to criminal penalties.

ceedings, finding that the district court abused its discretion in rejecting the guilty plea based solely on Maddox's denial of factual guilt during previous plea colloquy, where Maddox explained that he had initially misunderstood the court's questions. "Where a defendant offers a timely and reasonable explanation for actions that prompted a district court to reject a guilty plea, the court must at least exercise its discretion to ascertain whether its earlier concerns have been addressed." *Maddox*, 48 F.3d at 560.

The facts of this case are easily distinguishable from *Maddox*. Hernandez-Rivas was given ample opportunity to provide a factual basis, and he failed to recount a consistent story. In the initial attempts to elicit a factual basis, he denied any knowledge and could not provide facts that he was even in reckless disregard of the illegal nature of his actions. After an opportunity to talk with counsel, Hernandez-Rivas provided the court with a number of explanations, which were insufficient and far from reasonable. The court told Hernandez-Rivas at the beginning of the hearing that if he could not hear the interpretations, or had any problems with the headphones, to alert the court. However, Hernandez-Rivas failed to tell the court about the noise in the headphones until his third attempt at a factual basis.

Moreover, when Hernandez-Rivas moved to dismiss his counsel, he argued that his attorney told him that the judge would only accept his plea if Hernandez-Rivas admitted that he knew the passengers were illegal aliens. Hernandez-Rivas further maintained that he did not know the individuals were illegal aliens, and he did not want to lie to the court. Yet again, Hernandez-Rivas changed his story, this time reverting back to the position that he did not know he was committing a crime. We will not disturb the court's findings that the inconsistencies in Hernandez-Rivas's stories and his excuses

were insufficient to establish a factual basis for the charges against him.

In light of his failed attempts to plead guilty, and in light of the myriad of inconsistencies in his pleas, the court reasonably interpreted Hernandez-Rivas's remarks as an indication that his plea was not knowing and voluntary, and that he did not believe he had committed a crime. The district judge acted within his discretion when he rejected Hernandez-Rivas's initial guilty plea, and his reasons for rejecting the initial plea and the subsequent attempted pleas are sound.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*