**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2078-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EDWIN ESTRADA,

    Defendant-Appellant.

_____

Submitted September 12, 2016 — Remanded September 26, 2016
Resubmitted May 14, 2018 — Decided June 12, 2018

Before Judges Sabatino, Nugent and Currier.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Indictment No.
11-03-0444.

Joseph E. Krakora, Public Defender, attorney
for appellant (Margaret McLane, Assistant
Deputy Public Defender, of counsel and on the
briefs).

Dennis Calo, Acting Bergen County Prosecutor,
attorney for respondent (Catherine A. Foddai,
Special Deputy Attorney General/Acting Senior
Assistant Prosecutor, on the brief; Annmarie
Cozzi, Special Deputy Attorney General/Acting
Senior Assistant Prosecutor, of counsel and
on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

This matter returns to this court following a remand we called for in our September 2016 unpublished opinion. State v. Estrada, ("Estrada I") No. A-2078-14 (App. Div. Sep. 26, 2016), motion for leave to appeal denied, 228 N.J. 500 (2017). Our opinion vacated an order nullifying a negotiated plea agreement and directed the trial court to consider the nullification issue anew, using appropriate legal standards. Id., slip op. at 16. On remand, a different judge in the trial court reconsidered the issues and independently concluded the plea agreement should be set aside.

For the reasons that follow, we vacate the trial court's May 15, 2017 nullification order, reinstate the original negotiated guilty plea, and remand the matter for sentencing.

I.

We substantially incorporate by reference the factual and procedural background described in our September 2016 opinion. We supplement and update that background as follows.

In March 2011, defendant Edwin Estrada and his co-defendant, Andrew Abella, were charged in a thirteen-count indictment, the first eleven counts of which pertained to Estrada. Count one charged defendant with conspiring with Abella to commit burglary. Counts two and three charged both men with burglary. Count four

charged defendant with murder, count five with burglary, count seven with robbery, counts six and eight with felony murder predicated on the burglary and robbery counts, respectively, count nine with credit card theft, and counts ten and eleven with weapons offenses.

As its most serious count, the indictment accused defendant of murdering an elderly victim after breaking into the victim's house to rob him. The State's proofs reflected that defendant repeatedly struck the victim in the head with a metal pot, and then fled the scene with the victim's credit card. Defendant was age eighteen at the time, and he had no prior criminal or juvenile record. The victim, the grandfather of one of defendant's acquaintances, was age eighty-eight.

Following the indictment, defendant was evaluated by a board-certified psychiatrist, Dr. Azariah Eshkenazi, an Assistant Professor of Psychiatry at the Mount Sinai School of Medicine. In his report, the expert diagnosed defendant with bipolar disorder and polysubstance abuse. Dr. Eshkenazi opined that, at the time of the lethal events in the victim's home, defendant's "ability to formulate an intent [to kill the victim] was certainly impaired to one degree or another." The expert attributed that impairment to defendant's "psychiatric condition and the drugs that he abused . . . ." The expert's findings are consistent with defendant's

account that he had ingested angel dust and smoked marijuana in the victim's bathroom before the attack, had begun to hallucinate, and perceived that the victim was armed and about to shoot him.

The State disputed defendant's claims of diminished capacity. Its case was bolstered by the fact that defendant had made inculpatory statements when he was interviewed by police after his arrest. There was also clear and undisputed evidence that defendant was the person who had attacked the victim.

The prosecutor's office and defense counsel engaged in lengthy plea negotiations for about a year. During that time, the prosecutor's office had an estimated thirty discussions with members of the victim's family. Some of those family members wanted the maximum punishment imposed on defendant, while others were willing to accept a plea agreement that exposed defendant to a less severe sentence.

On January 22, 2013, defendant and his counsel appeared before a judge in the Criminal Part ("the first judge") and presented to him a negotiated plea. Under the terms of that plea, defendant agreed to forego a trial and plead guilty to a reduced charge of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a). The State, in turn, agreed to recommend to the court a sentence of a twenty-seven-year custodial term, subject to an 85% parole ineligibility period under the No Early Release Act ("NERA"),

N.J.S.A. 2C:43-7.2. The first judge accepted the factual basis placed on the record to support the aggravated manslaughter conviction, as well as the terms of the plea agreement. The matter was then set down for sentencing.

On March 8, 2013, the parties appeared before a different judge for sentencing ("the second judge"). Following an extended colloquy, the second judge vacated the plea. Defendant filed a motion for leave to appeal, which this court denied.

Defendant was tried before a third judge, and a jury, in a four-week trial ending in July 2014. He was found guilty of all eleven counts of the indictment.

On October 24, 2014, defendant was sentenced on count four, first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), to a sixty-year term of incarceration, with eighty-five percent parole ineligibility under NERA. Counts six, eight, ten, and eleven merged into count four. The prison terms for the remaining counts were made concurrent to count four.

Defendant appealed to this court. Among other things, he argued the second judge abused her discretion by setting aside the negotiated plea. He also raised various contentions of trial error.

In our unpublished September 2016 opinion, we reached only the plea nullification issue, finding that the second judge had

erred in several respects. <u>Estrada I</u>, slip op. at 11. Specifically, we held that the second judge erred when she: concluded that voluntary intoxication was not a defense to purposeful murder; found that the expert report from the examining psychologist, Dr. Eshkenazi, did not support defendant's diminished capacity defense; invoked her own life experiences to inform her legal judgment; and gave undue weight to the statements of the victim's family in deciding whether to accept or reject the plea. <u>Id.</u> at 11-14.

Because of these errors, we vacated the 2013 order setting aside the plea and remanded for "reexamination of the negotiated plea under the appropriate legal criteria expressed in <u>Rule</u> 3:9-3(e) and case law," and "[a] fresh assessment of whether the plea should or should not be set aside . . . ." <u>Id.</u> at 14. In so ruling, we declined to "determine in advance the scope of what the trial court [could] consider in the remand proceeding," including "what, if any, weight or consideration [should] be accorded to the [trial] proofs" or the guilty verdicts, leaving these questions "of scope and relevance" to be decided in the first instance by the trial court. <u>Id.</u> at 14-15.

Following a hearing, a fourth judge set aside the plea agreement a second time, after finding the agreement did not serve the interests of justice. The judge largely relied on the report

and trial testimony of the State's psychiatric expert, Dr. Steven Simring, along with the presentence report and the trial testimony of both defendant and Dr. Eshkenazi. Following her ruling on the plea, the judge ruled that the sixty-year prison sentence imposed after the trial should "remain in full force and effect."

Defendant now appeals again. He renews these arguments from his original brief that were not addressed in our September 2016 opinion:

> [POINT I (ORIGINAL APPEAL) OMITTED.]
>
> POINT II (ORIGINAL APPEAL)
>
> THE STATE'S EXPERT IMPROPERLY PROVIDED IRRELEVANT AND HIGHLY PREJUDICIAL TESTIMONY WHICH REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS (Partially Raised Below).
>
> A. Ultimate Issue Testimony.
>
> B. Irrelevant and Prejudicial Responses.
>
> POINT III (ORIGINAL APPEAL)
>
> THE COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE FELONY AND THE DEATH MUST BE INTEGRAL PARTS OF ONE CONTINUOUS TRANSACTION AND THAT THE DIMINISHED CAPACITY DEFENSE WAS RELEVANT TO THIS QUESTION (Partially Raised Below).
>
> POINT IV (ORIGINAL APPEAL)
>
> DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE BECAUSE THE COURT IMPROPERLY FAILED TO FIND MITIGATING FACTOR 4, INADEQUATELY CONSIDERED DEFENDANT'S YOUNG AGE, IMPROPERLY FOUND

7

AGGRAVATING FACTOR 1, AND ENGAGED IN IMPERMISSIBLE DOUBLE-COUNTING.

REPLY POINT I (ORIGINAL APPEAL)

IT WAS AN ABUSE OF DISCRETION TO REJECT DEFENDANT'S GUILTY PLEA.

REPLY POINT II (ORIGINAL APPEAL)

THE STATE'S EXPERT IMPROPERLY TESTIFIED TO THE ULTIMATE ISSUE, REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS.

He also raised these points in a pro se supplemental brief:

PRO SE POINT I

FAILURE OF THE TRIAL COURT TO SUBMIT WRITTEN COPIES OF JURY INSTRUCTIONS T[O] JURORS FOR USE IN DELIBERATIONS WAS IN VIOLATION OF R. 1:8-3(B)(2) AND VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL. (Raised Below).

PRO SE POINT II

THE TRIAL COURT ERRED IN ALLOWING HEARSAY TESTIMONY REGARDING THE DECED[E]NT'S STATEMENTS IN VIOLATION OF THE HEARSAY RULE.

PRO SE POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DISALLOWING ANY MENTION TO THE JURORS BY EITHER THE DEFENDANT, HIS FAMILY MEMBERS, OR THE DEFENSE PSYCHIATRIC EXPERT, OR ANY WITNESSES FOR EITHER THE DEFENSE OR THE PROSECUTION, THAT THE DEFENDANT HAD PREVIOUSLY ATTEMPTED SUICIDE IN SPITE OF THE FACT THAT THE STATE'S PSYCHIATRIC EXPERT MENTIONED AND TOOK INTO ACCOUNT, THESE ATTEMPTED SUICIDES IN HIS REPORTS. (Raised Below).

<u>PRO SE POINT IV</u>

THE TRIAL COURT COMMITTED REVERSIBLE ERROR
WHEN IT DISALLOWED ANY TESTIMONY RELEVANT TO
DEFENDANT'S CLAIMS THAT HE WAS SEXUALLY ABUSED
AS A CHILD BY HIS FATHER. (Raised below).

<u>PRO SE POINT V</u>

THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR
TRIAL WHEN THE TRIAL COURT ABUSED ITS
DISCRETION AND ALLOWED THE PROSECUTOR TO
PRESENT HYPOTHETICAL QUESTIONS AND COMMENTS
REFERENCING DEFENDANT BY NAME. (Partially
Raised Below).

<u>PRO SE POINT VI</u>

THE STATE WITHHELD CRITICAL IMPEACHMENT
EVIDENCE IN THE FORM OF A PLEA AGREEMENT WITH
DEFENDANT'S CO-DEFENDANT, ANDRE ABELLA, WHO
TESTIFIED AGAINST DEFENDANT.

<u>PRO SE POINT VII</u>

THE CUMULATIVE EFFECT OF THE ERRORS COMPLAINED
OF HEREIN AND THOSE ARTICULATED BY APPELLATE
COUNSEL WHEN VIEWED IN THEIR TOTALITY,
DEPRIVED DEFENDANT OF A FAIR TRIAL UNDER THE
DUE PROCESS CLAUSE OF THE UNITED STATES
CONSTITUTION, AMENDMENT XIV.

In addition, defendant raises in his supplemental brief the
following points contesting the outcome of the remand:

<u>POINT I</u> (POST-REMAND APPEAL)

THE TRIAL COURT ERRED IN REJECTING THE PLEA
AGREEMENT. DEFENDANT MUST BE RESENTENCED IN
ACCORDANCE WITH THE PLEA AGREEMENT.

A. The Trial Court Erred In Rejecting The
Plea Agreement On Remand Because Specific
Performance Of The Plea Agreement Is The

Appropriate Remedy Following The Wrongful Rejection Of A Plea.

B.   Even If Specific Performance Of The Plea Agreement Were Not Required, The Trial Court Was Required To Treat All Parties As They Were Situated At The Time Of The Wrongful Plea Rejection.  The Court Could Not Consider The Fact Of Defendant's Conviction Or Any Of The Trial Evidence When Determining If The Plea Agreement Was In The Interests Of Justice.

1.   The remand court's reasons for considering the trial evidence were flawed.

2.   Out-of-state cases further demonstrate that the remand court could not consider anything that was not before the original judge who rejected the plea agreement.

C.    Alternatively, It Was An Abuse Of Discretion To Reject This Plea Agreement.

II.

We begin our post-remand review by addressing the pivotal issues concerning the fourth judge's nullification of defendant's plea agreement with the State.  As a predicate to that analysis, we set forth key aspects of the record that emerged before and at trial.

<u>Defendant's Statement to the Police</u>

On the night of his arrest, defendant gave a recorded statement to police that would later be played for the jury at trial.  In his statement, defendant admitted he broke into the

10

victim's apartment because he needed money. Defendant said he was friends with Abella, who told him that Abella's grandfather, the victim, kept "crisp fifties" in his apartment. Defendant told police he previously had broken into the apartment with Abella to steal goods on two other occasions, once in May and once in June.

Defendant walked into the apartment on July 15 through the unlocked front door because he wanted to steal money to buy drugs. Defendant had incorrectly assumed the victim was not home, but discovered that he was on the couch in front of the television, apparently asleep. Defendant became concerned that the victim might "start[] hurting [him]," and might have a gun. For his "safety," defendant began looking for a weapon to protect himself. Defendant saw a knife in the kitchen, but grabbed a pot instead, because he did not want to murder the victim, and just wanted to knock him out.

According to defendant, upon seeing him, the victim started "bugging out" and "grabbing" him. The victim then put his hand behind his back as if to pull something out. Defendant used the pot he had taken from the kitchen to hit the victim on the head "[p]robably two or four times . . . ." The victim was breathing heavily and said, "stop, stop," after which defendant struck him once more.

After the attack, defendant cleaned blood off of his sneakers and placed a pillow on the floor to absorb the blood flowing from the victim's head. Defendant started panicking because he was concerned about being arrested for murder, and so he fled, taking the victim's wallet and phone with him and leaving behind a watch that had broken off of his wrist during the assault.

Defendant further admitted that, after leaving the apartment, he went to New York, where he used the victim's credit card to buy food and other goods.

Factual Basis for the Diminished Capacity Defense

On September 6, 2012, Dr. Eshkenazi conducted a psychological evaluation of defendant while he was in custody. Dr. Eshkenazi's findings would later form the basis of both defendant's guilty plea to aggravated manslaughter and, after that plea was vacated, his sole defense at trial.

Defendant told Dr. Eshkenazi that he could not be sure what had happened the night that he burglarized the victim's apartment and attacked him, because he was under the influence of Phencyclidine ("PCP"), a mind-altering drug he was regularly taking to help him with the "voices" in his head. Defendant related to Dr. Eshkenazi that on the night of the burglary he remembered "breaking into a house through a window, sitting on a toilet in the house and smoking [m]arijuana." He also recalled,

as he had told police, that he believed the victim had a gun. Defendant also told Dr. Eshkenazi that just before he struck the victim with the pot he heard voices telling him "[d]o it, do it . . . ."

In his report, Dr. Eshkenazi concluded that: "as a result of [defendant's] psychiatric condition, that of Bipolar Disorder and Attention Deficit Hyperactivity Disorder superimposed on drug and alcohol abuse, his ability to formulate an intent was certainly impaired to one degree or another."

The record contained no other psychological examination of defendant at the time the court set aside his guilty plea to aggravated manslaughter on March 8, 2013.

After the court set aside the plea, Dr. Simring, the State's psychological expert, examined defendant on two dates in September 2013. In October 2013, Dr. Simring issued a report containing his conclusions and findings, which negated defendant's claim of diminished capacity.

Trial Testimony

At trial, in further support of his defense of diminished capacity and intoxication, defendant presented Dr. Dmitri Primak of the Bergen Regional Medical Center, who testified that defendant had been admitted to the hospital on May 25, 2010, a few weeks before the fatal assault. Dr. Primak testified that defendant had

13

been discharged on June 4 with a diagnosis of PCP dependence, attention deficit disorder, and anti-social traits.

Additionally, Dr. Eshkenazi testified, consistent with his report, that defendant's drug intake "caused him to become almost psychotic, superimposed on his condition of bipolar disorder," which Dr. Eshkenazi "found affected his ability to form motive or intent at the time of the crime to one degree or another."

Defendant testified on his own behalf. As he had in his police statement, defendant admitted that he: broke into the victim's apartment without permission intending to steal money to feed his PCP addiction; took a pot from the kitchen for protection because he believed the victim had a gun; bludgeoned the victim with the pot between two and four times; fled to New York with the victim's wallet and phone; and, in New York, used the victim's credit card to purchase food and other items. He also admitted burglarizing the victim's apartment with Abella a month before the attack. Defendant did not testify about the other prior burglary on which he was also being tried.

Defendant's trial testimony differed from his recorded statement to police in several respects. First, defendant unequivocally told police that he remembered what happened the night of the attack. But, at trial, defendant testified that he "blacked out" around the time that he was striking the fatal blows.

Defendant also did not tell police he had taken drugs before attacking the victim, while, at trial, he testified that, prior to entering the apartment, he took PCP and marijuana, which initially made him feel ecstatic, but later made him feel paranoid. Also, defendant testified that, after entering the apartment, he immediately went to the victim's bathroom to smoke more marijuana and PCP for twenty to twenty-five minutes, because he was feeling "paranoid" and "wanted a . . . secure place," but defendant had not told police either that he went to the bathroom upon entering the apartment or that he ingested drugs while inside the apartment.

Dr. Simring, who the court qualified as an expert in forensic psychiatry, testified on behalf of the State. Dr. Simring disputed Dr. Eshkenazi's conclusions, particularly that defendant suffered from bipolar disorder. Dr. Simring noted that when defendant was released from Bergen Regional Medical Center a few weeks before he attacked the victim, the hospital had not diagnosed him with bipolar disorder or any other psychiatric illness other than polysubstance abuse. Dr. Simring acknowledged that defendant was provisionally diagnosed with A.D.H.D., but that there were no signs of psychosis, depression, mania, or bipolar disorder.

Dr. Simring testified that, "at all phases of this incident," defendant "was able to act with purpose and knowledge . . . ." In reaching this conclusion, Dr. Simring rejected defendant's

testimony that he "blacked out," because defendant had an "unbroken stream of memory" of certain parts of the event, including seeing the victim, deciding to grab a pot, and striking the victim with it. Dr. Simring also rejected defendant's testimony that he had heard voices, because there was no "psychiatric evidence" or "background evidence" that supported defendant's assertion.

Part of Dr. Simring's basis for discounting defendant's version of events was that it differed greatly from the version defendant had previously told police, which, Dr. Simring testified, "comport[ed] very, very closely" to other evidence in the case including the "physical evidence." Defense counsel objected to that portion of Dr. Simring's testimony, but the objection was overruled without discussion.

### The Jury Charge

At the charge conference, counsel initially agreed that the jury could consider diminished capacity or intoxication as a defense to the charges of purposeful murder (count four), second degree burglary (count five), robbery (count seven), felony murder predicated on robbery (count eight), and the two possession of a weapon charges (counts ten and eleven), but not the remaining counts. Consistent with this consensus, the court's final jury charge limited the jury's consideration of the defense to these counts only. The jury was specifically directed not to consider

either defense with respect to felony murder predicated on burglary (count six).

Before deliberations began, however, defendant reversed course and asked the judge to instruct the jury that it could still consider diminished capacity and intoxication as defenses to felony murder based on burglary under count six, even if it found defendant guilty of the predicate second-degree burglary. The court rejected defendant's request, finding that the adduced facts did not support such an instruction.

## III.

Defendant's threshold argument in this appeal is that he was entitled to "specific performance" of his plea bargain, based on our holding in Estrada I that the second judge had committed material errors when she set aside the plea in March 2013. Defendant argues that the fourth judge had an "independent obligation" to reinstate the plea and issue a conforming sentence. We disagree. Defendant's argument is inconsistent with the terms of this court's remand and also with controlling precedent.

Defendant did not raise a specific performance argument below. Rather, he conceded in the trial court that the fourth judge had discretion to reassess the plea agreement to determine whether it served the interests of justice. Therefore, the decision to reassess the plea should be reviewed for plain error,

pursuant to which any error should be disregarded unless "clearly capable of producing an unjust result." State v. Ross, 218 N.J. 130, 143 (2014); R. 2:10-2.

"Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable and pragmatic tool in the efficient and fair administration of criminal justice." State v. Taylor, 80 N.J. 353, 360-61 (1979) (citations omitted). "It is commonly known that the vast majority of all cases are resolved through plea agreements with the State." State v. Munroe, 210 N.J. 429, 447-48 (2012).

Nevertheless, as this court has previously explained, "[p]lea bargaining is not a right of a defendant or the prosecution. It is an accommodation which the judicial system is free to institute or reject." State v. Brimage, 271 N.J. Super. 369, 379 (App. Div. 1994). Accordingly, "[i]f at the time of sentencing the court determines that the interests of justice would not be served by effectuating the agreement . . . the court may vacate the plea . . . ." R. 3:9-3(e).

"A plea agreement is . . . governed by contract-law concepts." State v. Pennington, 154 N.J. 344, 362 (1998) (partially abrogated on other grounds by State v. Pierce, 188 N.J. 155, 168 (2006)) (citations omitted). Specifically, "the parties agree that defendant will plead guilty to certain offenses in exchange for

the prosecution's recommendation to dismiss other charges and suggest a certain sentence, all subject to the right of the court to accept or reject the agreement in the interest of justice." State v. Means, 191 N.J. 610, 622 (2007). Though the agreement contractually binds both the defendant and the State to its terms, the court is not a party to the agreement and cannot be so bound. See Santobello v. New York, 404 U.S. 257, 262 (1971) ("There is, of course, no absolute right to have a guilty plea accepted." (citations omitted)); State v. Warren, 115 N.J. 433, 442 (1989) (holding that the parties to a plea agreement "are not empowered to negotiate a sentence that can have any binding effect" on the court); State v. Kovack, 91 N.J. 476, 484 (1982) (holding that neither the defendant nor the State "has an absolute right to have the sentence conform to the specific terms of the agreement"); State v. Rosario, 391 N.J. Super. 1, 14-15 (App. Div. 2007) ("[T]he plea judge can always reject a plea agreement, and generally defendant has no right to require the judge to accept it."). Not only is the court not bound by the plea, but the court's conditional concurrence is an express term of the agreement. R. 3:9-3(c).

In support of his contrary position, defendant relies principally on four New Jersey cases: Means, 191 N.J. at 622; State v. Conway, 416 N.J. Super. 406 (App. Div. 2010); State v.

19

Madan, 366 N.J. Super. 98 (App. Div. 2004); and State v. Salentre ("Salentre I"), 242 N.J. Super. 108 (App. Div. 1990). None of these cases compels or persuades us to adopt defendant's position on the specific performance issue.

Means reinstated an improperly vacated plea and remanded "for further proceedings consistent with [its] opinion," but declined to order the trial court to issue the negotiated sentence automatically without first assessing the plea under Rule 3:9-3(e). Means, 191 N.J. at 622. Indeed, the Court's rationale for the remand was, in part, that "[b]y vacating the plea agreement without first allowing notice to be given to the victims, the trial court was not fairly able to determine whether to accept the plea or reject the plea agreement in the interest of justice." Ibid. Therefore, Means preserved the judicial role in evaluating pleas, contrary to the "specific performance" remedy defendant now asserts was necessary here.

As to the three other cases on which defendant relies, Conway, 416 N.J. Super. at 413; Madan, 366 N.J. Super. at 115; Salentre I, 242 N.J. Super. at 113, defendant is correct that, in each case, this court directly reinstated plea agreements that had previously been improperly vacated. But these opinions did not hold that automatically issuing the negotiated sentence from the plea was the only acceptable remedy for an improperly rejected

plea. Rather, this court exercised in those matters its discretionary power of original jurisdiction. See N.J. Const. art. VI, § 5, ¶ 3 ("[T]he Appellate Division of the Superior Court may exercise such original jurisdiction as may be necessary to the complete determination of any cause on review."); R. 2:10-5 (incorporating the constitutional provision with mostly identical language).

Here, by contrast, we declined in September 2016 to invoke our original jurisdiction to order a specific sentence. Estrada I, slip op. at 10. Adhering to our direction to undertake a "fresh assessment" of the plea, the trial court did not err in doing so.

Defendant also claims five opinions from other jurisdictions support the remedy he seeks: United States v. Rea-Beltran, 457 F.3d 695 (7th Cir. 2006); United States v. Shepherd, 102 F.3d 558 (D.C. Cir. 1996); Lewandowski v. Makel, 949 F.2d 884 (6th Cir. 1991); United States v. Gaskins, 485 F.2d 1046 (D.C. Circ. 1973); Williams v. State, 605 A.2d 103 (Md. 1992).

The courts in Rea-Beltran, Shepherd, and Williams did not order specific performance of plea agreements, as defendant claims. Rather, in each case, the reviewing court preserved the lower court's ability to accept or reject the negotiated sentence.

See <u>Rea-Beltran</u>, 457 F.3d at 703; <u>Shepherd</u>, 102 F.3d at 564; <u>Williams</u>, 605 A.2d at 111.[1]

In sum, defendant is not entitled to specific performance of the plea agreement. Instead, an independent assessment of the plea under the governing "interests of justice" standard is required.

IV.

We next address what evidence the fourth judge was permitted on remand to consider when she was reassessing defendant's plea agreement. Defendant argues that the judge erred by considering evidence that emerged at trial as part of the overall analysis. We disagree.

<u>Rule</u> 3:9-3 neither defines the term "the interests of justice," nor lists the factors that should inform whether an agreement is consistent with such interests. This gap has been filled, however, by case law.

---

[1] To be sure, the <u>Gaskins</u> and <u>Lewandowski</u> courts went further and directly mandated reinstatement of the sentences that had been negotiated in the underlying plea agreements, but those cases are distinguishable from the present case. In <u>Gaskins</u>, the D.C. Circuit remanded "with instructions to accept a plea of guilty," but, unlike here, the lower court's error concerned the factual basis for the plea, not the justness of the negotiated sentence. <u>Gaskins</u>, 485 F.2d at 1049. The Sixth Circuit ordered specific performance of a plea in <u>Lewandowski</u>. But that case is also distinguishable on its unique facts involving the defendant's appellate attorney's constitutionally defective performance in having the negotiated plea vacated. <u>Lewandowski</u>, 949 F.2d at 886.

Several principles have emerged from the few published decisions involving the review of judicial nullification of a plea agreement. First, we held in our September 2016 opinion, although a sentencing judge may consider the victim's family's wishes in assessing whether a plea serves the interests of justice, the court must not forfeit its role as arbiter of the plea agreement. Estrada I, slip op. at 16. See also Means, 191 N.J. at 622; Madan, 366 N.J. Super. at 114.

Second, a court cannot ignore the defendant's criminal record as set forth in the presentence report. See State v. Daniels, 276 N.J. Super. 483, 488 (App. Div. 1994). If the defendant's criminal record is extensive, it may require the court to find that an overly lenient sentence does not serve the interests of justice. See Ibid. But see Madan, 366 N.J. Super. at 111 (holding that the defendant's criminal record "though not insubstantial, was insufficient to serve as a rational underpinning to reject an otherwise reasonable plea").

Third, a mistake of law or fact may warrant a finding of an abuse of discretion. See id. at 110; Salentre I, 242 N.J. Super. at 112-13.

Fourth, when assessing whether a plea agreement serves the interests of justice, courts should "evaluate the facts, both admitted and debated, apply those facts that can be established to

the law, and then test the plea agreement against the facts, the law, and the range of permissible sentences under the Code." Madan, 366 N.J. Super. at 114 (emphasis added).

Fifth, courts should not favor one version of the facts "when several versions are likely to be presented to the jury." Ibid. "The possibility of a defendant being found guilty of a greater offense . . . does not, in and of itself, provide a basis for rejecting a plea." Id. at 110.

On remand in this case, the fourth judge considered the reports and trial testimony of both the State and defense expert witnesses, as well as the March 2013 presentence report that predated the initial plea nullification. The fourth judge stated that there was "no credible evidence in the record that the defendant suffered from bipolar disorder, nor . . . that defendant was suffering from diminished capacity at the time of the crime." Relying on Dr. Simring's conclusions, the judge noted defendant's hospitalization records contained no evidence of mental illness, although there was evidence that defendant "suffered from polysubstance abuse, and used a variety of drugs on a regular basis." The judge observed that defendant recalled several specific details about the events surrounding the murder, which showed that his actions were knowing and purposeful. As the judge concluded:

Taking into account the totality of the circumstances, the manner and method of the murder, the psychiatric evaluations, and the ability of defendant to recall the most minute detail on the night of the murder, <u>the defense of diminished capacity has no basis in the record</u>. Dr. Simring was clear in his opinion that defendant had the ability to form the requisite intent to commit the crimes. Therefore, this court finds that it is not in the interest of justice to accept the plea agreement entered into by the parties . . . .

[(Emphasis added).]

Because the question of what evidence the trial court was entitled to consider under <u>Rule</u> 3:9-3 is a strictly legal determination, this court's review of that issue is de novo. <u>See</u> <u>State v. Handy</u>, 206 N.J. 39, 45 (2011) ("[A]ppellate review of legal determinations is plenary.").

Defendant argues that the trial court erred by looking beyond the limited evidence available when the plea was first set aside in 2013. Defendant further contends that all of the trial proofs were "tainted by judicial error," since the trial itself was the result of the errors made by the court when vacating the plea. The State counters that the "interests of justice" standard necessarily involves an assessment of the totality of the circumstances and that "justice should not be blind" to trial evidence.

25                                                          A-2078-14T3

Rule 3:9-3 expressly preserves the judicial power to accept or reject a plea until the time of "sentencing." The original foundation for the rule was a memorandum from the Administrative Director of the Courts that refers to the judge evaluating the plea as the "sentencing judge." Edward B. McConnell, Administrative Memo Re: Criminal Pleas, 94 N.J.L.J. No. 1, Index Page 1 (1971). See also Pressler & Verniero, Current N.J. Court Rules, cmt.1 on R. 3:9-3 (2018) (explaining that Rule 3:9-3 "follows generally the guidelines set forth" in this cited memorandum). The rule defers assessment of whether a plea serves the interests of justice until sentencing specifically because when "a plea is entered the judge ordinarily has before him only the offense," and a "fuller picture of the offender does not emerge until . . . the judge has had the benefit of a defendant's presentence report." State v. Brockington, 140 N.J. Super. 422, 427 (App. Div. 1976).

As a general matter, courts have long preferred broadening, rather than restricting, the information a judge may consider at sentencing. For example, our court rules and case law provide that a presentence investigation and report is mandatory. Rule 3:21-2(a); N.J.S.A. 2C:44-6(a); State v. Roth, 95 N.J. 334, 357 (1984). The presentence report "shall contain all presentence material having any bearing whatever on the sentence," Rule 3:21-

2, and may be "updated," as the court directs, prior to a resentencing hearing that follows a remand. State v. Tavares, 286 N.J. Super. 610, 616 (App. Div. 1996). In the court's discretion, it may further decide, before imposing sentence, to order additional medical or psychological testing of a defendant. N.J.S.A. 2C:44-6(c).

In imposing a sentence that arises from a negotiated plea, the judge "may look to other evidence in the record," besides the plea colloquy, and the court is required to "consider 'the whole person,' and all the circumstances surrounding the commission of the crime." State v. Sainz, 107 N.J. 283, 293 (1987) (citations omitted). Those circumstances may include the court's prior resolution of "evidentiary issues" and other "developments at pretrial conferences," as well as guilty pleas or trials of co-defendants. State v. Salentre ("Salentre II"), 275 N.J. Super. 410, 419, n.3 (App. Div. 1994). Combining these principles, the "interests of justice" assessment of a plea agreement necessarily "consider[s] . . . all the circumstances surrounding the commission of the crime," whether those circumstances were articulated at a plea proceeding or not. Sainz, 107 N.J. at 293.

Accordingly, when testing the plea agreement in Madan against the record, we noted the trial facts were not significantly different from and were "little more incriminating" than the facts

available at the time of the plea. <u>Madan</u>, 366 N.J. Super. at 104. This is an assessment that we obviously could not have made without considering the trial facts. We found in <u>Madan</u> that the jury instructions on aggravated manslaughter, ordinary manslaughter, and self-defense were "warranted by the evidence" presented at trial, <u>id.</u> at 110, "as the presentence report presaged . . . ." <u>Id.</u> at 114.

In the present case, our September 2016 opinion directed the trial court to reassess the plea and, if the plea was reinstated, to "resentence defendant accordingly." <u>Estrada I</u>, slip op. at 16. Adhering to the expansive approach to sentencing-related matters in our State, the trial court was required to view defendant as he stood "before the court on that day," <u>State v. Randolph</u>, 210 N.J. 330, 354 (2012), which necessarily included testing the plea against the trial facts and the law. <u>See</u> <u>Madan</u>, 366 N.J. Super. at 104.

Therefore, the fourth judge did not err on remand by considering the evidence that emerged at trial in evaluating the "interests of justice." Doing so was consistent both with sentencing law generally and also with <u>Madan</u>.[2]

_____

[2] Defendant cites several cases from other jurisdictions in which he claims courts did not consider trial evidence when reassessing a plea agreement on remand. <u>See</u> <u>United States v. Navedo</u>, 516 F.2d 293 (2d Cir. 1975); <u>State v. Darelli</u>, 72 P.3d 1277 (Ariz. Ct. App.

Having concluded the trial court properly considered the evidence that emerged at trial as part of the "interests of justice" assessment, we turn to consider defendant's argument that the court misapplied its discretion by setting aside the plea.

The crux of the trial court's remand decision was its finding that "the defense of diminished capacity ha[d] no basis in the record." This pivotal finding was inaccurate. Both Dr. Eshkenazi and defendant testified at trial that defendant's drug abuse and psychological issues impaired his ability to act with purpose on the night of the offense. Based on this testimony, the jury was appropriately instructed to "consider and weigh all of the evidence of the defendant's mental state, including evidence of bipolar disorder superimposed on drug abuse, in determining whether

2003); In re Alvernaz, 2 Cal. 4th 924 (1992); People v. Allen, 815 N.E.2d 426 (Ill. 2004); People v. Curry, 687 N.E.2d 877 (Ill. 1997); State v. Hager, 630 N.W.2d 828 (Iowa 2001); State v. Sears, 208 W.Va. 700 (W.Va. 2000); State v. Lentowski, 212 Wis. 2d 849 (Ct. App. 1997). None of those cases are persuasive. Notably, none of the procedural rules governing those cases feature the "interests of justice" phrase. Compare R. 3:9-3(e) ("If at the time of sentencing the court determines that the interests of justice would not be served by effectuating the agreement . . . the court may vacate the plea") with Fed. R. Crim. P. 11(c)(3)(A) ("[T]he court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report."). See also Ariz. R. Crim. P. 17.4(d); Cal. Penal Code § 1018; Ill. Sup. Ct. R. 402; Iowa R. Crim. P. 2.8; W. Va. R. Crim. P. 11(e)(4); Wis. Stat. Ann. § 971.08. These cases do not provide meaningful guidance, and we do not rely upon them.

[defendant] acted with a requisite state of mind, forming elements of the offense charged in the indictment." The jury was further instructed, also appropriately, that if it determined that defendant's diminished capacity from drug use prevented him from acting purposely or knowingly, it could go on to consider whether defendant was guilty of the lesser-included offense of aggravated manslaughter, the same offense to which defendant had entered the rejected guilty plea.

The fact that the jury was so instructed reflects that Dr. Eshkenazi's and defendant's testimony presented at least a rational basis for the diminished-capacity affirmative defense. See State v. Daniels, 224 N.J. 168, 181 (2016) (holding that the trial court should provide an affirmative defense charge requested by the defense if "there is a rational basis to do so based on the evidence"). Hence, the trial court erred on remand by holding there was "no basis in the record" to support an aggravated manslaughter conviction, particularly because that offense was the subject of reasonable debate at trial.

Our opinion in Madan advised that in considering whether to nullify a plea, courts should not favor one version of the facts "when several versions are likely to be presented to the jury," Madan, 366 N.J. Super. at 114, and that the "possibility of . . . being found guilty of a greater offense," does not provide a valid

foundation on which to reject a plea. Id. at 110. This deference to the factual underpinnings of a guilty plea is consistent with a long line of precedent. See, e.g., Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."); State v. Gregory, 220 N.J. 413, 420 (2015) (At the plea stage, "the trial court is not making determinations such as the credibility of witnesses . . ."); State v. Slater, 198 N.J. 145, 156 (2009) ("[A] defendant's representations and the trial court's findings during a plea hearing create a 'formidable barrier'. . .") (citations omitted). See also People v. Montalvo, 173 Cal. Rptr. 51, 54-55 (Ct. App. 1981) ("[A] trial judge, in determining whether to accept or reject a proposed plea bargain, may hear conflicting versions of the facts of the case . . . . [The judge's] evaluation of those facts, in order to determine whether to accept a plea bargain, does not involve resolution of factual conflict.").

Here, not only was the lesser-included offense of aggravated manslaughter based on the affirmative defense of diminished capacity "likely" to be put before the jury, it was actually presented to the jury at trial, notably without any objection from the State. The fact that defendant ultimately was convicted of the greater offense of first-degree murder does not justify rejecting his prior negotiated plea to the lesser-included offense

of aggravated manslaughter, because the aggravated manslaughter plea was at least rationally supported by the record. See Madan, 366 N.J. Super. at 115 ("An error-free trial following the erroneous rejection of a plea agreement does not cure the pretrial error."); Lafler v. Cooper, 566 U.S. 156, 166 ("Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence."). Where "debated" facts supported the plea, the court should not have elevated one set of facts — the facts supporting knowing and purposeful murder — above the other — the contrary facts supporting aggravated manslaughter. See Madan, 366 N.J. Super. at 110, 114.

Regardless of the ultimate merit before the jury of the affirmative defense of diminished capacity, the negotiated plea was premised on the pendency of that defense. At trial, both sides agreed the defense had sufficient evidentiary support to place the issue before the jury. The trial court's finding that the defense had "no basis in the record" thus misconstrued the record and renders the nullification of the plea unsound.

The prosecution faced a significant risk that a jury would be persuaded by defendant's lay and expert proof of his alleged diminished capacity. At the outset of the original sentencing

32                                              A-2078-14T3

proceeding in 2013, the State was prepared to eliminate that risk and proceed with the plea bargain it had negotiated with defendant. It was not until the court intervened and raised concerns about the plea agreement being too lenient that the State extemporaneously reversed its position. The reversal was not initiated by the prosecution itself. In fact, the assistant prosecutor at the 2013 sentencing initially represented to the court that his office "did everything in [its] power to try to find a just result[,] balancing the interests most particularly of the family" and "great thought and care went into" the negotiated plea. Although prosecutors are certainly free to change their minds, the distinctive sequence of events bears upon the issues before us.

For these reasons, we hold that the court erred by finding that the negotiated plea agreement amending the charge of murder to aggravated manslaughter did not serve the "interests of justice" under Rule 3:9-3(e).

The question becomes what remedy at this point is appropriate. We have considered remanding to have the plea nullification issue assessed by the trial court a third time. We reject that option. The protracted chronology of this litigation must come to an end. In hindsight, we recognize that granting interlocutory review of defendant's motion for leave to appeal might have obviated some

of these consequences. On the other hand, we are also mindful that this unusual case has presented many novel issues, the analysis of which benefited from a full record and successive briefing.

At this point, we elect to exercise our original jurisdiction pursuant to Rule 2:10-5, and direct that the trial court enter an order reinstating the original negotiated guilty plea with the State and proceed to sentencing. In doing so, we fully recognize the reprehensible nature of defendant's mortal acts. We also are mindful of the emotional toll imposed on both the members of the victim's family and defendant and his own relatives in the lengthy proceedings that have already transpired. We also recognize the State was satisfied in 2013 to enter into a plea agreement capping defendant's sentence exposure at twenty-seven years. By no means do we suggest an appropriate sentence. We simply conclude the "interests of justice" warrant reinstatement of the original negotiated agreement.

## VI.

Although we need not reach the remaining issues posed on appeal, we shall note, for sake of completeness, that we have duly considered all of them. None of the points raised by defendant and his counsel have sufficient merit to warrant discussion. R. 2:11-3(e)(2). Our only comment is that, although there is

reasonable room to debate the issue, we are unpersuaded the trial judge misapplied his considerable zone of discretion in allowing Dr. Simring to comment on arguably ultimate issues within his expert testimony. See N.J.R.E. 704; State v. Prall, 231 N.J. 567 (2018) (recognizing the deference owed to criminal trial judges on evidentiary issues).

Hence, if, hypothetically, our decision to reinstate the original plea agreement is overturned, there should be no need for any further remand to address open issues.

The trial court's May 15, 2017 order nullifying the plea agreement is therefore vacated. The matter is remanded for sentencing under the terms of the original plea agreement. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION