FILED

05/18/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 12, 2021 Session

**STATE OF TENNESSEE v. COREY FOREST**

**Appeal from the Circuit Court for Maury County**
**No. 24034    David L. Allen, Judge**

_____

**No. M2020-00329-CCA-R3-CD**

_____

Following a bench trial, the trial court judge convicted the Defendant, Corey Forest, of possession of over .5 grams of cocaine with intent to sell and possession of a firearm during the commission of a dangerous felony and imposed an effective sentence of eleven years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress evidence found during a search of his vehicle. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Corey Forest.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Adam Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a stop of the Defendant's vehicle on April 8, 2014, and the subsequent search of the Defendant's vehicle during which law enforcement officers found cocaine, marijuana, and a handgun. Consequently, a Maury County grand jury indicted the Defendant in February 2015 for possession of twenty-six grams or more of cocaine with intent to sell in a drug-free zone, simple possession of marijuana, and unlawful possession of a firearm during the commission of a dangerous felony. The Defendant filed a motion to suppress that is the subject of this appeal; however, this is the third time this case has been before this court, so we begin with a brief procedural history before

summarizing the evidence relevant to the Defendant's appeal.

## A. Procedural History

On April 29, 2015, the Defendant filed an unsuccessful motion to suppress that is the subject of this appeal and thereafter entered a guilty plea, reserving a certified question of law regarding the suppression issue. On appeal, this court dismissed the claim because the certified question of law was overbroad and lacked specificity. *State v. Corey Forest*, No. M2016-00463-CCA-R3-CD, 2017 WL 416 290, at \*5 (Tenn. Crim. App., at Nashville, Jan. 31, 2017), *no perm. app. filed*.

The Defendant then filed a successful petition for post-conviction relief, alleging that his attorney provided ineffective assistance by improperly reserving the certified question of law. The trial court found that the Defendant had received ineffective assistance of counsel and vacated the judgments from the guilty plea. The Defendant again entered a guilty plea, reserving a corrected certified question of law on his suppression issue. On appeal, this court vacated the trial court's order for failure to follow the post-conviction procedures and dismissed the appeal for lack of jurisdiction. *State v. Corey Forest*, No. M2017-01126-CCA-R3-CD, 2018 WL 4057813, at \*4 (Tenn. Crim. App., Nashville, Aug. 27, 2018), *no perm. app. filed.*

On remand, the trial court appointed new counsel who filed an amended petition for post-conviction relief alleging that trial counsel was ineffective. After an evidentiary hearing, the trial court granted post-conviction relief. This time, the Defendant elected a bench trial where he was convicted of possession of over .5 grams of cocaine with intent to sell, and possession of a firearm during the commission of a dangerous felony.[1] The Defendant timely filed this appeal challenging the trial court's denial of his April 29, 2015 suppression motion.

## B. Motion to Suppress

The Defendant's April 29, 2015 motion to suppress, contended, among other things, that the City of Columbia police officer lacked jurisdiction to act outside the City of Columbia, that police officers illegally stopped his vehicle, and that any evidence derived from the subsequent search of his vehicle should be suppressed. As relevant to this appeal, we summarize the evidence from the 2015 suppression hearing and the subsequent 2020 bench trial.

---

[1] Before the trial began, the State announced that it would not be pursing the drug-free zone enhancement in Count 1 and entered a "noll[e]" as to the simple possession of marijuana in Count 2. After the evidence had been presented, the State moved to amend Count 1 of the indictment from possession of 26 grams or more (Class A felony) to possession of over .5 grams or more (Class B felony).

## 1. August 7, 2015 Suppression Hearing

Columbia Police Department Officer Neylan Barber testified that he stopped the Defendant's vehicle for speeding on April 18, 2014. Officer Barber followed the Defendant's vehicle as part of a drug investigation. The Narcotics Task Force had received information that drugs were being sold at an apartment complex located near Columbia State Community College, and law enforcement had observed suspicious patterns of activity at the identified residence. During the two-day surveillance of the apartment, police officers observed the Defendant at the residence multiple times and, each time he left the residence, there was a steady increase in the number of people to and from the residence. The narcotics task force confirmed that narcotics were being sold from the particular residence the Defendant frequented over those two days, based upon stops of individuals leaving the residence.

Based upon these observations, law enforcement decided to stop the Defendant's vehicle. At the direction of Narcotics Task Force Lieutenant James Shannon, Officer Barber followed the Defendant's vehicle from the apartment complex. Officer Barber believed that he had reasonable suspicion to stop the Defendant at this point based upon the Defendant's suspected involvement in the drug operation; however, he waited for a traffic violation before stopping the Defendant. Officer Barber paced the Defendant, who was driving sixty miles per hour in a fifty-five mile per hour zone. The speed limit dropped to fifty miles per hour and the Defendant maintained his speed so Officer Barber initiated a traffic stop based upon speeding. A video recording of the stop indicated that the stop was initiated at 10:17 p.m. The Defendant provided Officer Barber with a driver's license and proof of insurance but was unable to provide his registration at that time.

Officer Barber testified that the Defendant also provided him with a handgun carry permit. When the Defendant retrieved these items from his wallet, Officer Barber observed what appeared to be a "couple hundred dollars" in twenty-dollar bills in the Defendant's wallet. Officer Barber described how, as shown in the video, he left the Defendant's vehicle and returned to his police vehicle to run the Defendant's license through the NCIC database and through the Tennessee State Portal system to check for outstanding warrants. Officer Barber then returned to the Defendant's vehicle at 10:22 p.m. to get the Defendant's registration from him. As Officer Barber returned to his vehicle Trooper Kilpatrick arrived with a K-9 officer (narcotic drug dog). The time on the video recording indicated 10:23 p.m. Officer Barber stated that when another officer at the scene asked the Defendant where he was coming from, he stated that he had been at Buffalo Wild Wings prior to the traffic stop. Officer Barber knew this to be untrue because he had followed the Defendant from a "known drug house" at the apartment complex.

When Officer Barber returned the Defendant's paperwork to him, Officer Barber asked for consent to search the Defendant's vehicle. He suspected that the Defendant was in possession of illegal narcotics based on the following facts: the residence from which the Defendant had come, the amount of cash in lower denominations in his wallet, his frequenting the suspected residence over the course of the two-day surveillance period, the subsequent increase in traffic to and from the residence following the Defendant's presence, and the Defendant lying about where he had come from during the traffic stop. The Defendant refused to consent to a search, and Officer Barber informed him that the K-9 officer was going to perform a search around his vehicle to check for illegal narcotics at 10:25 p.m. The K-9 officer approached the Defendant's vehicle at 10:25 p.m. and thereafter indicated the presence of drugs in the Defendant's vehicle. A subsequent search revealed five smaller bags of cocaine inside a larger bag, totaling 30.92 grams of cocaine, found inside the sunroof enclosure.

On cross-examination, Officer Barber agreed that, although he observed increased foot traffic to and from the apartment while the Defendant's vehicle was present, he did not observe any drug transactions during the two-day surveillance of the apartment. Lieutenant Shannon instructed Officer Barber, who drove a marked police car, to follow the Defendant from the apartment complex and "find a traffic stop" on him. Officer Barber testified that he left the Columbia city limit in Maury County at some point while he was following the Defendant. Officer Barber testified that he was less than a mile from crossing into Lawrence County when he activated his emergency lights.

Officer Barber testified that he measured the Defendant's speed by "pacing" his vehicle, gauging the Defendant's vehicle's speed against his own. Officer Barber stated that he stopped the Defendant's vehicle with no intention of writing him a speeding ticket, and that it was a "pre-textual stop" based on Officer Barber's belief that the Defendant's vehicle contained illegal narcotics. When he stopped the Defendant's vehicle, Officer Barber knew that the K-9 officer was en route to the scene. Officer Barber agreed that, before he stopped the Defendant, he received a radio transmission informing him that the Defendant's driver's license was "clear," but no mention was made about the Defendant's registration or whether he had any outstanding warrants.

Officer Barber agreed that when the K-9 officer arrived at the scene, he "abandoned" the pretext of writing the Defendant a speeding ticket and furthered the investigation into the narcotics instead. Officer Barber clarified that confirmation of drugs being sold from the identified residence in the apartment complex came from statements given to police by people who were stopped after leaving the apartment and who were also in possession of drugs.

On redirect-examination, Officer Barber stated that he was "confident" that the

Defendant was traveling sixty miles per hour in a fifty mile per hour zone when Officer Barber initiated the traffic stop.

Trooper Michael Kilpatrick testified that he worked for the Tennessee Highway Patrol and that his K-9 performed a "drug sniff" on the Defendant's vehicle. Trooper Kilpatrick testified that he received the call to bring the K-9 to the traffic stop before the Defendant's vehicle was actually stopped. He was on the scene for less than a minute before the K-9 drug sniff was performed.

On cross-examination, Trooper Kilpatrick stated that he was not sure how long it took him to arrive at the scene after he received the call to assist. He denied that other officers were "waiting around" for him; he stated Officer Barber and the Defendant were "conducting business" when he arrived.

On redirect-examination, Trooper Kilpatrick stated that he received the call to assist in a traffic stop of the Defendant's vehicle "in case" a stop was made. He denied that there was any "definiteness" to the call.

The trial court questioned Officer Barber further about the traffic stop. Officer Barber stated that he had the paperwork available to write the Defendant a speeding ticket but that he gave him a warning to slow down in order to be "lenient" on him. The trial court denied the Defendant's motion making the following findings:

> The Court does find this is the most extreme example of a pre-textual stop that this Judge has ever seen where an officer in a marked car along with one or two additional city officers follows the suspect 15 or 20 miles beyond the municipal limits of the City of Columbia and finally stops the car within a quarter of a mile of leaving the county. And I've had a case where an off-duty officer stopped a car north of Pulaski when that officer was maybe on his way home. But it was a car weaving all over the road, a DUI stop, and one that did result in an arrest.

> . . . .

> The Court noted in the video that the vehicle was stopped at about [10:17 p.m.]. That the dog arrives at the driver's side of the vehicle at [10:26 p.m.]. . . . But you can actually see [Trooper Kilpatrick] and the dog within nine minutes or so after the stop. There is less expectation of privacy in a vehicle situation. And as the State argues, the Court's not impressed with the separate indicia of suspicion relied upon by Officer Barber, but may be taken together along with what he knew about the Columbia [apartment

complex] residence and other circumstances. The nine minute period of detention [of the Defendant] was not unreasonable.

Again, it's a borderline case, because the Court is not impressed with the [drug] dog's conduct in indicating any sort of certainty of [drug] scent. . . . The Court finds that Tennessee cases would permit it and that [*Rodriguez v. U.S.*, 135 S. Ct. 1609 (2015)] does not seem to prohibit such officer conduct. Therefore, the Court finds the period of detention was reasonable and not constitutionally defective under both the State and Federal Constitutions. But like I say, it's the most extreme pre-textual stop I've ever seen.

## 2. February 24, 2020 Bench Trial

Columbia Police Department Officer[2] Jeff Seagroves testified about his involvement in this case. After receiving information about narcotics being sold out of a specific apartment in Jackson Manor apartment complex, the Narcotics Unit conducted surveillance. During the surveillance, law enforcement observed the Defendant's vehicle, a Cadillac Escalade, arrive at the apartment. After the Defendant left, "traffic" increased to the apartment and people who were stopped by law enforcement leaving the apartment "had purchased illegal narcotics." Law enforcement witnessed the Defendant's arrival and departure several times with the same resulting activity. Based upon this activity, investigators believed the Defendant was supplying the apartment with narcotics.

Officer Seagroves was also present at the April 18, 2014 traffic stop and observed Officer Barber engage in the "normal procedures for the traffic stop." As Officer Barber did so, Trooper Kilpatrick arrived with the K-9 officer.

Officer Barber also testified at the Defendant's trial. His testimony was largely consistent with his testimony from the suppression hearing. He clarified that in the area where the Defendant was driving and ultimately arrested, there was a posted sixty-five mile per hour zone that changed to a fifty-five mile per hour zone and then to a fifty mile per hour zone. The Defendant drove sixty miles per hour in the fifty-five mile per hour zone and continued to do so in the fifty mile per hour zone. Officer Barber additionally testified that when he approached the Defendant's vehicle, the Defendant, who was alone, appeared nervous and had "labored breathing." Officer Barber requested the Defendant's license, registration, and insurance; however, the Defendant could only produce his license and insurance. As the Defendant opened his wallet to get his license, Officer Barber noted

---

[2] Officer Seagroves worked as a Narcotics Investigator at the time of the traffic stop but had been since reassigned as a Task Force Officer for the Drug Enforcement Administration.

numerous twenty-dollar bills, later determined to be $382 in US currency, in the Defendant's wallet, which further raised suspicion. While the Defendant continued to search for his registration, Officer Barber returned to his police car to "run [the Defendant's] information." When he returned to the Defendant's vehicle, the Defendant produced his registration. As Officer Barber walked back to his car to check the registration, Trooper Kilpatrick arrived with the K-9 officer. Also, Officer Barber learned from another officer that the Defendant had told him that "he had just come from Buffalo Wild Wings." Officer Barber knew this information to be untrue because he had followed the Defendant from the Jackson Manor Apartments. Officer Barber checked the Defendant's vehicle registration and then returned to the Defendant's vehicle and asked for consent to search. The Defendant declined to give consent, and the K-9 officer conducted a "drug sniff" search.

Following the bench trial, the trial court found the Defendant guilty of possession of over .5 grams of cocaine with intent to sell and possession of a firearm during the commission of a dangerous felony. The trial court imposed an effective sentence of eleven years in the Tennessee Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress. Specifically, he argues that there was not probable cause for the traffic stop and that the traffic stop was unreasonably prolonged due to the arrival of the K-9 officer. The State responds that the officer initiated the traffic stop based upon the Defendant exceeding the posted speed limit, providing probable cause for the stop and that the duration of the stop was reasonable. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on

a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)).

Likewise, Article I, Section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons . . . from unreasonable searches and seizures." Tenn. Const. art. I, § 7. This Court has stated that the Tennessee Constitution's search and seizure provision "is identical in intent and purpose with the Fourth Amendment." *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968); *see also, e.g., State v. Scarborough*, 201 S.W.3d 607, 622 (Tenn. 2006). Accordingly, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan,* 958 S.W.2d at 629 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn.1996)).

There are three levels of police-citizen interactions: (1) a full-scale arrest, which must be supported by probable cause in order to be valid; (2) a brief investigatory detention, which must be supported by a reasonable suspicion, based upon specific and articulable facts, of criminal wrong-doing; and (3) a brief "encounter" which requires no objective justification. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). Moreover, the distinction between a stop based on probable cause and a stop based on reasonable suspicion is not simply academic. Reasonable suspicion will support only a brief, investigatory stop. *See Terry v. Ohio*, 392 U.S. 1, 27-29 (1968); *see also United States v. Bentley*, 795 F.3d 630, 633 (7th Cir. 2015) (noting the necessity to "distinguish between stops based on reasonable suspicion and those based on probable cause [because] [t]he latter are not subject to the scope and duration restrictions of *Terry*").

A reasonable basis for a stop is something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. "The evaluation [of reasonable suspicion] is made from the perspective of the reasonable officer, not the reasonable person." *State v. Smith*, 484 S.W.3d 393, 402 (Tenn. Feb. 11, 2016) (citing *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003); and *United States*

*v. Valdez*, 147 Fed. Appx. 591, 596 (6th Cir. 2005)). Moreover, because a court reviews the validity of a stop from a purely objective perspective, the officer's subjective state of mind is irrelevant, *see Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), and the court may consider relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as reasons for the stop, *see Smith*, 484 S.W.3d at 402 (citing *City of Highland Park v. Kane*, 372 Ill. Dec. 26, 991 N.E.2d 333, 338 (Ill. App. Ct. 2013) (recognizing that, "[i]n analyzing whether a stop was proper, a court is not limited to bases cited by the officer for effectuating the stop" (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see also State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996) (recognizing that an officer's subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed")). Additionally, if the defendant attempts to suppress evidence collected during the challenged stop, the state is not limited in its opposing argument to the grounds ostensibly relied upon by the officer if the proof supports the stop on other grounds. *Smith*, 484 S.W.3d at 402 (citing *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004)).

Furthermore, it is well settled that: "Probable cause"—the higher standard necessary to make a full-scale arrest - means more than bare suspicion: "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160 (1949) (quoting *Carroll v. United States*, 267 U.S. 132 (1925)). "This determination depends upon 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Goines v. State*, 572 S.W.2d 644, 647 (Tenn. 1978) (quoting *Beck v. Ohio*, 379 U.S. 89 (1964)). "In dealing with probable cause, . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar*, 338 U.S. at 175; *See Day*, 263 S.W.3d at 902-03.

Here, Officer Barber had reasonable suspicion to stop the Defendant based upon evidence gathered during the two-day surveillance of an apartment that the Defendant had frequented; however, Officer Barber chose to wait and make a traffic stop. Officer Barber observed the Defendant driving sixty miles per hour in both a fifty-five mile per hour zone and a fifty-mile per hour zone. It is an offense for a motorist to exceed the applicable speed limit. *See* T.C.A. § 55-8-152 (2012). This court has held that a police officer's traffic stop will pass constitutional muster if the officer has "probable cause" to believe that the motorist has committed a traffic offense. *See State v. Vineyard*, 958 S.W.2d 730, 736 (Tenn. 1997) (holding that officers' observation of defendant's violations of traffic laws created probable cause to stop defendant); *see also United States v. Barry*, 98 F.3d 373,

376 (8th Cir.1996) (recognizing that even minor traffic violations create probable cause to stop the driver). Accordingly, Officer Barber had probable cause for the traffic stop.

The Defendant complains that the stop was merely a pretext for a narcotics investigation. An officer's subjective motivation for making a traffic stop, however, does not invalidate a stop. *See Whren*, 517 U.S. at 813 (a traffic violation arrest is not rendered invalid by the fact the stop was a pretext for a narcotics investigation). Officer Barber had probable cause to believe the Defendant was violating the laws against speeding.

The Defendant also complains that the stop and subsequent search were illegal because Officer Barber was outside of his municipal jurisdiction at the time of the stop. Tennessee Code Annotated section 40-7-109 (2018), provides authority for a private person to make an arrest. This court has determined that officers have the authority to arrest defendants under the private arrest statute, noting that a "police officer does not give up the right to act as a private citizen when he is off duty or out of his jurisdiction." *State v. Donnie Alfred Johnson*, No. 02C01-9707-CC-00261, 1998 WL 464898, at *2 (Tenn. Crim. App., at Jackson, Aug. 11, 1998), *no perm. app. filed*. Although this court had repeatedly cautioned that when an officer acts under the private arrest statute, they do so at their own peril. *See State v. Horace Durham*, No. 01C01-9503-CC-00056, 1995 WL 678811, at *2 (Tenn. Crim. App., at Nashville, Nov. 16, 1995), *no perm. app. filed*..

Finally, the Defendant argues that the duration of the traffic stop was unreasonably prolonged due to the use of a K-9 officer. If an officer's initial stop of an individual is justified, then it must next be determined whether the seizure and search of the individual are "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998). If "the time, manner or scope of the investigation exceeds" the ambit of reasonableness, a constitutionally permissible stop may be transformed into one which violates the Fourth Amendment and article 1, section 7 of the Tennessee Constitution. *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting *United States v. Childs*, 256 F.3d 559, 564 (7th Cir. 2001). However, "no hard-and-fast time limit exists beyond which a detention is automatically considered too long and, thereby unreasonable." *State v. Justin Paul Bruce*, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215, at *7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005), *no. perm. app. filed*.

In Tennessee, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance

of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." *State v. Gonzalo Garcia*, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App., Nashville, Feb. 20, 2002) (citations omitted), *overruled on other grounds by State v. Garcia*, 123 S.W.3d 335 (Tenn. 2003).

After hearing the evidence presented at the suppression hearing, the trial court concluded that "the period of detention was reasonable." The record supports the trial court's finding. Officer Barber testified that he approached the Defendant, informed him of the reason for the stop, and asked for his license and registration. He said that the Defendant appeared to be nervous in his movement and breathing pattern. Officer Barber also noticed a large amount of cash in smaller denominations in the Defendant's wallet. Initially the Defendant could not find his vehicle registration. The Defendant continued searching for his registration while Officer Barber returned to his vehicle to check the Defendant's license and insurance information. When Officer Barber returned the documentation to the Defendant, the Defendant had found his registration. Officer Barber took the registration and as he returned to his vehicle, Trooper Kilpatrick spoke to him. Another officer also informed Officer Barber that the Defendant had lied about where he had come from, adding to Officer Barber's suspicions about illegal activity. After confirming the Defendant's registration, he returned the document to the Defendant, issued a warning, and then asked for consent to search the vehicle. The Defendant declined, and Officer Barber informed him that the K-9 officer would circle his vehicle. The dog indicated that there were illegal drugs inside the vehicle providing probable cause for a search that revealed cocaine, marijuana, and a handgun.

We conclude that the circumstances in this case did not create an unreasonable detention. Officer Barber did not detain the Defendant any longer than necessary to conduct the stop. The stop concluded once Defendant received the warning, at which time the K-9 officer circled the vehicle and the request to search the Defendant's vehicle was appropriate under the circumstances. *See State v. Winford McLean*, No. E2010-02579-CCA-R3-CD, 2011 WL 5137177, at *6 (Tenn. Crim. App., at Knoxville, Oct. 28, 2011) (Defendant's overall nervous demeanor and criminal history as a "known drug violator" justified officer's request for consent to search after the traffic stop lasted 26 minutes), *no perm. app. filed.*; *State v. Kenneth L. Davis*, No. W2008-00226-CCA-R3-CD, 2009 WL 160927, at *4 (Tenn. Crim. App., at Jackson, Jan. 23, 2009) ("The actual issuance of the citation occurred almost simultaneously with [the officer's] request to search. The Defendant's detention was not unreasonable."), *perm. app. denied* (Tenn., June 15, 2009).

Accordingly, we conclude that there was probable cause for the traffic stop and that the Defendant was not unreasonably delayed due to the use of the K-9 officer. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing, we affirm the trial court's judgments.


_____

ROBERT W. WEDEMEYER, JUDGE